1  JOEL S. MILIBAND, #77438
   jmiliband@rusmiliband.com
2  LAUREL R. ZAESKE, #138510
   lzaeske@rusmiliband.com
3  SARA A. MAUNDER, #238104
   smaunder@rusmiliband.com
4  RUS, MILIBAND & SMITH
   A Professional Corporation
5  Seventh Floor
   2211 Michelson Drive
6  Irvine, California 92612
   Telephone:  (949) 752-7100
7  Facsimile:  (949) 252-1514

8  Attorneys for Chapter 7 Trustee,
   HELEN RYAN FRAZER

9

10                    UNITED STATES BANKRUPTCY COURT

11          CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

12  In re:                          )   Case No. LA05-28700 AA
13                                  )
                                    )   Chapter 7
14  STOCKWELL PROPERTIES, LLC,      )
                                    )   **MOTION FOR ORDER**
15                                  )   **DISALLOWING CLAIM NUMBER 25**
                    Debtor.         )   **FILED BY MARLENE M. COLUCCI;**
16                                  )   **DECLARATION OF HELEN R.**
                                    )   **FRAZER, ALAN L. KAHN, AND**
17                                  )   **LAUREL R. ZAESKE IN SUPPORT**
                                    )   **THEREOF**
18  _____)
                                        Date:   November 3, 2010
19                                      Time:   10:30 a.m.
                                        Ctrm:   1375
20

21

22

23

24

25

26

27

28

397186v1 sam 6/8/10 (2161-0018)1 1 (2161-0018)

1   TO THE HONORABLE ALAN M. AHART, UNITED STATES BANKRUPTCY COURT

2   JUDGE, CLAIMANT AND OTHER INTERESTED PARTIES:

3           Helen Ryan Frazer, the duly appointed and acting Chapter 7 Trustee ("Trustee") of

4   the Estate ("Estate") of Stockwell Properties, LLC (the "Debtor" and "Stockwell") hereby objects

5   to allowance of **Claim No. 25** filed by **Marlene M. Colucci** ("Mrs. Colucci" and/or "Claimant"),

6   in the amount of **$600,000.00**, which was filed on **December 18, 2006** ("Claim").  The Trustee

7   objects to the Claim pursuant to 11 U.S.C. §§502(b) and Rule 3007 of the Federal Rules of

8   Bankruptcy Procedure on the grounds that: (1) the Claim is not supported by facts or evidence of

9   a claim against the Debtor; and (2) the Debtor's books and records do not reflect that any

10  obligation is owed to the Claimant.

11  1.    OVERVIEW OF RELEVANT FACTS

12          On August 17, 2005, an involuntary petition was filed against Stockwell under

13  Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").  In December 2005, the

14  Court entered an Order authorizing the appointment of an interim Chapter 11 trustee.

15  On December 16, 2005, Helen Ryan Frazer was appointed the interim trustee.  On April 26,

16  2006, the Court entered an order for relief.  On August 4, 2006, the Court ordered the case

17  converted to Chapter 7 (the "Bankruptcy Case").  Helen Ryan Frazer is the Chapter 7 trustee.

18  The Court established February 26, 2007 as the claims bar date in the within proceeding.

19          Stockwell was formed for the purpose of purchasing and selling residential real

20  property.[1/]  At the time of the bankruptcy filing, Stockwell owned two residential properties

21  commonly referred to as the Wallingford Property and the Brunston Court Property.  The

22  Debtor's books and records reflect that substantially all of the business of the Debtor related to

23  maintaining and remodeling the real property owned by the Debtor.

24          The Trustee has reviewed the Proofs of Claims filed in this case as provided for

25  under Bankruptcy Code §704 and has had her accountants review the books and records of the

26  Debtor.  The Trustee's review of the Claim filed by Mrs. Colucci indicated that the

27  _____

28  [1/]    See, Rule 2004 Examination of Curtis Somoza, taken October 12, 2005 ("Somoza Depo.") at 13:8 to
14:7.  The portion of the Somoza Depo. referenced in the Motion are collectively attached as Exhibit "1."

1   documentation attached to the Proof of Claim was incomplete and did not support the Claim.

2   Among other things, one or more pages of the referenced Promissory Note was not included

3   (which would identify the maker, the payee, the amount or the date of the Promissory Note) and

4   the attached Deed of Trust was dated four (4) months after the date the debt was purportedly

5   incurred and the same day that the Bankruptcy Case was filed.[2/]

6          The Trustee's accountants review of the available books and records of the Debtor

7   did not identify any receipts in April 2005 in the amount of the Claim.  See, attached Declaration

8   of Alan L. Kahn.

9          On April 9, 2010, counsel for the Trustee sent a letter to Mrs. Colucci advising her

10   that the Stockwell banking records do not reflect that Stockwell received $600,000

11   from her on April 30, 2005, as reflected in the Claim, and requesting additional support that the

12   funds were actually advanced to, or for the benefit of, Stockwell.[3/]

13         On April 23, 2010, counsel for the Trustee received a letter from Stanley

14   Samorajczyk, counsel for Mrs. Colucci, advising that additional support would be forthcoming.[4/]

15   On May 3, 2010, counsel for Trustee attempted to contact Mr. Samorajczyk by telephone to

16   inquire about the status of the additional documentation, and was advised by the receptionist that

17   Mr. Samorajczyk was no longer with the firm.  Counsel for the Trustee left a message requesting

18   a return call from a representative from Akin Gump, but the call was never returned.

19         On November 16, 2009, the Trustee received an e-mail from Michele Colucci, on

20   behalf of her mother, Mrs. Colucci, stating, among other things, that the funds had been paid to

21   and/or invested with Ari Zieger, Michele Colucci's ex husband.[5/]

22         On November 18, 2009, counsel for the Trustee sent an e-mail to Michele Colucci

23

24   [2/]   A true and correct copy of the Claim is attached as Exhibit "2."

25   [3/]   A true and correct copy of the April 9, 2008 letter from Laurel Zaeske to Marlene Colucci, without
     enclosure, is attached as Exhibit "3."

26   [4/]   A true and correct copy of the April 23, 2008 letter from Stanley Samorajczyk to Laurel Zaeske is
27   attached as Exhibit "4."

28   [5/]   A true and correct copy of Michele Colucci's e-mail to the Trustee dated November 16, 2009 is attached
     as Exhibit "5."

1   requesting a return call and advising Michele of the claims filed by Mrs. Colucci and Ari Zieger.[6]

2   There was no further communication from Michele Colucci.

3         In or about June 2010, counsel for the Trustee again contacted Akin Gump

4   requesting additional support for the Claim.  On June 9, 2010, Brian Rothschild sent a letter to

5   counsel for the Trustee (the "Rothschild Letter") providing, among other things, a complete copy

6   of the Promissory Note, and contending that the claim was supported by the recorded Deed of

7   Trust and testimony of the Debtor's principal, Curtis Somoza.[7]

8         On June 10, 2010, counsel for the Trustee wrote to Mr. Rothschild requesting

9   documentation for proof of payment of the funds purportedly giving rise to the Claim.[8] There has

10  been no response to the June 10, 2010 e-mail from Mrs. Colucci or her counsel.

11  2.    <u>OBJECTIONS TO CLAIM</u>

12      A.    <u>The Claim Does Not Set Forth Sufficient Facts Or Evidence Supporting A Claim</u>

13          <u>Against The Debtor</u>

14        A Proof of Claim must set forth facts or evidence necessary to support a claim.

15  Bankruptcy Rule 3001(c) states in relevant part:

16          When a claim, or an interest in property of the
        debtor securing the claim, is based on a writing, the

17          original or duplicate shall be filed with proof of
        claim.  If the writing has been lost or destroyed, a

18          statement of the circumstances of the loss or
        destruction shall be filed with the claim.

19

20  A claimant must attach all necessary supporting documents to obtain prima facie validity under

21  Rule 3001.  *In re All American Auxiliary Association*, 95 Bankr. 540, 545 (Bankr. S.D. Ohio

22  1989).  Treating a claim that lacks the necessary support as valid can lead to abuses of the claims

23  process.  *Id.* at 545.  *See also, Matter of Louie*, 10 Bankr. 928 (Bankr. E.D. Mich. 1981) [without

24  _____

25     [6]   A true and correct copy of the November 18, 2009 e-mail from Laurel Zaeske to Michele Colucci, is
attached as Exhibit "6."

26     [7]   A true and correct copy of the June 9, 2010 e-mail from Brian Rothschild to Laurel Zaekse, with
enclosures, is attached as Exhibit "7."

27

28     [8]   A true and correct copy of the June 10, 2010 e-mail from Laurel Zaeske to Brian Rothschild is attached as
Exhibit "8."

1  the writing, the creditor's claim is defective, without being cured within the time allotted for

2  filing, the claim is disallowed].

3       The documentation provided in support of the Claim at issue herein is incomplete

4  and does not support a claim against the Debtor.  The Trustee's efforts to obtain additional

5  information similarly have not led to any evidence that Mrs. Colucci gave funds to or for the

6  benefit of the Debtor.  In fact, Michele Colucci's e-mail of November 18, 2009, states that the

7  funds were given to Ari Zieger to invest, and not paid to Stockwell.  See, Exhibit "6."  The

8  deposition testimony of Curtis Somoza attached to the Rothschild Letter similarly does not

9  support the Claim.  In the referenced testimony Mr. Somoza stated that he didn't recall the

10 consideration given for the Colucci Deed of Trust,[2] and only recalled funds received from the

11 Coluccis in November 2004, as part of a "friendly deal."

12      Mrs. Colucci has failed to present evidence to support a claim against the Debtor

13 and the Claim should be disallowed.

14     B.    <u>The Debtor's Books And Records Do Not Reflect An Obligation Owed To This</u>

15         <u>Claimant</u>

16      Section 502(b)(1) of the Bankruptcy Code provides that a claim asserted in a proof

17 of claim shall be allowed, except to the extent "such claim is unenforceable against the

18 debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. §502(b)(1).

19      As discussed above, the Trustee's accountants have reviewed the books and

20 records of the Debtor, including the banking records of the Debtor.  The review of the Debtor's

21 books and records did not indicate any business dealing between the Debtor and Mrs. Colucci or

22 any obligation owed by the Debtor to Mrs. Colucci.  Based upon the review of the Debtor's books

23 and records and the facts described above, the Trustee does not believe Mrs. Colucci has an

24 enforceable claim against the Debtor under any applicable law or agreement and, therefore, the

25 Debtor is not liable for such Claim.

26

27 _____

28    [2]   The Brunston Court property reflected in the Deed of Trust was subsequently foreclosed on by the first lien holder.

3.    <u>CONCLUSION</u>

        The Trustee respectfully requests that the Court enter an Order disallowing the

Claim in its entirety.


DATED:  September 27, 2010                    Respectfully submitted,

                                              RUS, MILIBAND & SMITH
                                              A Professional Corporation


                                              By:_____
                                                 LAUREL R. ZAESKE
                                                 Attorneys for Chapter 7 Trustee,
                                                 HELEN R. FRAZER

1                           <u>DECLARATION OF HELEN R. FRAZER</u>

2           I, HELEN R. FRAZER, declare as follows:

3              1.      I am the duly appointed and acting Chapter 7 Trustee of the Estate of

4 Stockwell Properties, LLC ( the "Debtor" and "Stockwell"). I also am an attorney duly

5 licensed to practice before all federal and state courts in California. I have firsthand personal

6 knowledge of the matters set forth herein and, if called upon as a witness, would and could

7 competently testify thereto.

8              2.      I make this declaration is support of my Motion For Order Disallowing

9 Claim Number 25 Filed By Marlene M. Colucci ("Motion").

10              3.      On August 17, 2005, an involuntary petition was filed against the Debtor

11 under Chapter 11 of Title 11 of the United States Code. In December 2005, the Court entered

12 an Order authorizing the appointment of an interim Chapter 11 trustee. On December 16,

13 2005, I was appointed the interim trustee. On April 26, 2006, the Court entered an order for

14 relief. On August 4, 2006, the Court ordered the case be converted to Chapter 7 (the

15 "Bankruptcy Case"). I am currently serving as the Chapter 7 trustee in the Bankruptcy Case.

16              4.      Attached hereto as Exhibit "1" are the portions of the Rule 2004

17 Examination of Curtis Somoza, taken October 12, 2005 as referenced in the Motion.

18              5.      I have reviewed all of the proofs of claim and the schedules filed in the

19 Bankruptcy Case. The proof of claim filed by Marlene M. Colucci in the amount of

20 $600,000.00 ("Claim") does not contain sufficient supporting documentation relating to

21 Stockwell. Among other things, the supporting documentation attached to the Claim is

22 incomplete. A true and correct copy of the Claim is attached as Exhibit "2."

23              6.      I asked my accountants, Crowe Horwath LLP (formerly Grobstein

24 Horwath & Company LLP), to review the books and records of the Debtor, including the

25 banking records of the Debtor, for any evidence that the Debtor had any business dealing with

26 Mrs. Colucci. They have advised me that the Debtor's books and records do not indicate any

27 business dealing between the Debtor and Mrs. Colucci or any obligation owed by the Debtor to

28 Mrs. Colucci.

7.    On November 16, 2009, I received an e-mail from Michele Colucci, on behalf of her mother, Mrs. Colucci, stating, among other things, that the funds had been paid to and/or invested with Ari Zieger, Michele Colucci's ex husband. A true and correct copy of Michele Colucci's November 16, 2009 e-mail is attached as Exhibit "5."

8.    Based upon my review of the Claim, my accountant's review of the Debtor's books and records, and the information set forth in the Motion, I do not believe that Mrs. Colucci has an enforceable claim against the Debtor.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed on September 23, 2010, at Cerritos, California.

HELEN R. FRAZER

## DECLARATION OF ALAN L. KAHN

I, ALAN L. KAHN, CPA, CIRA, CFF, declare as follows:

1.      I am a certified public accountant, duly licensed and authorized to practice accounting in the State of California, and am a Certified Insolvency and Restructuring Advisor ("CIRA"). I am a member in good standing of the American Institute of Certified Public Accountants (AICPA), and am a partner in the Insolvency and Litigation Department of Crowe Horwath LLP ("Crowe"), accountants for Helen R. Frazer ("Trustee"), the duly appointed and acting Chapter 7 Trustee of the Estate of Stockwell Properties, LLC (the "Debtor" and "Stockwell").

2.      I am the accountant at Crowe principally responsible for the services performed in the Stockwell bankruptcy case on behalf of the Trustee. The facts stated herein are within my personal knowledge or I have gained knowledge of them from Crowe staff members working under my supervision. If called upon as a witness, I would and could competently testify thereto.

3.      I make this declaration is support of the Trustee's Motion For Order Disallowing Claim Number 25 Filed By Marlene M. Colucci ("Motion").

4.      Crowe has undertaken a review of the books and records obtained from the Debtor, financial institutions, and third parties as part of the Trustee's efforts in the Stockwell bankruptcy case. These records include Stockwell's Accounts Payable Register for the period October 2004 through May 2005; Stockwell's Account Transaction Register for the period January 2004 through October 2004, and various bank statements of Stockwell and some corresponding disbursements and receipts for the period March 2003 through September 2005 (collectively, the "Books and Records").

5.      Crowe has reviewed the Books and Records, for any evidence that the Debtor had any business dealing with the Claimant, Marlene M. Colucci.

/ / /

/ / /

/ / /

1   The Books and Records do not indicate any direct business dealings between the Debtor and

2   Mrs. Colucci or any obligation owed by the Debtor to Mrs. Colucci.

3           I declare under penalty of perjury under the laws of the State of California and

4   the United States of America that the foregoing is true and correct.  Executed on September

5   23, 2010, at Sherman Oaks, California.

6

7

8   ALAN L. KAHN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>DECLARATION OF LAUREL R. ZAESKE</u>

I, LAUREL R. ZAESKE, declare as follows:

1.      I am an attorney at law duly licensed to practice before the above-entitled Court and am a member of the law firm of Rus, Miliband & Smith, a Professional Corporation, attorneys of record for Helen R. Frazer, Chapter 7 Trustee ("Trustee") in the above-entitled action.

2.      I have firsthand personal knowledge of the matters set forth herein and if called upon as a witness to testify could and would competently thereto.

3.      I make this declaration in support of Trustee's Motion For Order Disallowing Claim Number 25 ($600,000.00) Filed By Marlene M. Colucci ("Claimant").

4.      On April 9, 2010, I sent a letter to Mrs. Colucci advising her that the Stockwell banking records do not reflect that Stockwell received $600,000 from her on April 30, 2005, as reflected in the Claim, and requested additional support that the funds were actually advanced to, or for the benefit of, Stockwell. A true and correct copy of my April 9, 2008 letter to Marlene Colucci, without enclosure, is attached as Exhibit "3."

5.      On April 23, 2010, I received a letter from Stanley Samorajczyk, counsel for Mrs. Colucci, advising that additional support would be forthcoming. A true and correct copy of the April 23, 2008 letter from Stanley Samorajczyk to me is attached as Exhibit "4." On May 3, 2010, I attempted to contact Mr. Samorajczyk by telephone to inquire about the status of the additional documentation, and was advised by the receptionist that Mr. Samorajczyk was no longer with the firm. I left a message requesting a return call from a representative from Akin Gump, but the call was never returned.

6.      In response to an e-mail from Michele Colucci to the Trustee, on November 18, 2009, I sent an e-mail to Michele Colucci requesting a return call and advising Michele of the claims filed by Mrs. Colucci and Ari Zieger. A true and correct copy of my November 18, 2009 e-mail to Michele Colucci is attached as Exhibit "6." There was no further communication from Michele Colucci.

7.     In or about June 2010, I again contacted Akin Gump requesting additional support for the Claim. On June 9, 2010, Brian Rothschild sent a letter to me providing, among other things, a complete copy of the Promissory Note, and contending that the claim was supported by the recorded Deed of Trust and testimony of the Debtor's principal, Curtis Somoza. A true and correct copy of the June 9, 2010 e-mail from Brian Rothschild to me, with enclosures, is attached as Exhibit "7."

8.     On June 10, 2010, I wrote to Mr. Rothschild requesting documentation for proof of payment of the funds purportedly giving rise to the Claim. A true and correct copy of my June 10, 2010 e-mail to Brian Rothschild is attached as Exhibit "8." There has been no response to my June 10, 2010 e-mail from Mrs. Colucci or her counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed this ⌀⁷ day of September, 2010, at Irvine, California.

LAUREL R. ZAESKE

**"EXHIBIT 1"**

Somoza101205.txt

1              UNITED STATES BANKRUPTCY COURT

2      CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

3

4

5      In Re:                        ) Case No. LA 05-28700-AA
                                     )
6                                    )
                                     ) Volume I
7                                    ) (Pages 1 to 157)
                                     )
8      STOCKWELL PROPERTIES, LLC,    )
                                     )
9                                    )
                                     )
10                                   )
                                     )
11          Debtor.                  )
       _____)

12

13

14

15

16              RULE 2004 EXAMINATION

17              CURTIS D. SOMOZA

18          Wednesday, October 12, 2005

19             Encino, California

20

21

22

23

24     Reported by:

25     CHERYL A. MARTIN
       CSR NO. 4974

                                                    1

Page 1

```
 1          MS. SOKOL:  Yeah.  Let's go off the record.
 2       THE VIDEOGRAPHER:  Off record at 10:59.
 3            (Discussion off the record.)
 4       THE VIDEOGRAPHER:  On record at 11:01.
 5       MS. SOKOL:  Could we read back perhaps the last two
 6   questions.
 7       MR. NAHMIAS:  Sure.
 8       (Record read as follows:
 9            "How do you know Stockwell
10         Properties, sir?
11            "I formed Stockwell Properties
12            "And it's a limited liability
13         corporation?
14            "Company.
15            "Company?
16            "Yes.
17            "Who are its members
18            "I don't know the answer to that.
19            "Are you one of its members?")
20       THE WITNESS:  Can I go back and address those?
21   BY MR. NAHMIAS:
22       Q    Please.
23       A    I'm a managing member of the company personally.
24   The units, the membership units, of LLC is held by my
25   trust.
```

12

1       Q     Are any of the units held by any other person or
2   entity that you know of?
3       A     Not that I know of.
4       Q     So you believe your trust --
5       A     I believe my thrust owns 100 percent of the
6   units.
7       Q     Great.  Thank you.
8             Do you recall when you formed Stockwell?
9       A     Roughly?
10      Q     Sure.
11      A     I believe approximately three or four years ago.
12  I don't exactly recall.
13      Q     So 2001 to 2002?
14      A     It would have been most likely 2002 because
15  I think we only had a 2003 tax return.  So we didn't
16  actually place it in service -- or in business until
17  2003.  So it would have only been a few months prior that
18  I formed it.
19      Q     Very well.
20            What was the purpose for which it was formed?
21      A     To purchase and resell properties.
22      Q     Residential?
23      A     Residential.
24      Q     Does it, in fact, own residential properties as
25  of today?

13

1  A Yes, it does.

2  Q Can you tell me how many and what the addresses

3 of those properties are?

4  A Two properties.  The first one being 3970

5 Brunston Court, Westlake Village.  The second one being

6 2571 Wallingford Drive in Beverly Hills.

7  Q Very well.

8   I'm going to mark as exhibits -- I'll start with

9 Exhibit 1 -- I hope I have enough copies for everybody --

10 the Notice of Motion and Motion of Mr. Burtzloff to take

11 the Videotaped Examination of Stockwell Properties.

12 Here's Exhibit 1.

13   (Whereupon Exhibit 1 was marked for

14   identification and is attached hereto.)

15 BY MR. NAHMIAS:

16  Q Take a moment or two and review this, please.

17   As you're reviewing it, have you seen that

18 document before?

19  A I believe so.

20  Q Do you recall the first time you saw it?

21  A No, I don't.

22  Q Do you recall how you viewed it, in other words,

23 how it was presented to you?  Did you receive it in the

24 mail?

25  A I don't recall.  I believe I would have seen it

14

**"EXHIBIT 2"**

FORM B10 (Official Form 10) (Rev. 10/05)

| UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>**STOCKWELL PROPERTIES LLC** | Case Number:<br>**05-28700** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**MARLENE M. COLUCCI**<br><br>Name and address where notices should be sent:<br>Marlene M. Colucci<br>4267 Marina City Drive, Unit 604/606<br>Marina Del Rey, California 90292<br><br>Telephone number: 310-448-8118 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |

**THIS SPACE IS FOR COURT USE ONLY**

**FILED**

DEC 1 8 2006

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

| Last four digits of account or other number by which creditor identifies debtor: | Check here if this claim | ☐ replaces or,<br>☐ amends a previously filed claim, dated: |
|---|---|---|

| | |
|---|---|
| **1.   Basis for Claim**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly):  Promissory Note | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Last four digits of your SS#<br><br>Unpaid compensation for services performed<br><br>From_____ to _____<br>       (date)                         (date) |

| **2.   Date debt was incurred:**<br>April 30, 2005 | **3.   If court judgment, date obtained:** |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed.

| | |
|---|---|
| See reverse side for important explanations.<br><br>**Unsecured Nonpriority Claim $600,000 (plus interest)**<br><br>☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.<br><br>**Unsecured Priority Claim**<br>☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority<br><br>   Amount entitled to priority $<br><br>   Specify the priority of the claim:<br>☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)<br><br>☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier — 11 U.S.C. § 507(a)(4)<br><br>☐ Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5) | **Secured Claim**<br>☐ Check this box if your claim is secured by collateral (including right of setoff)<br><br>Brief Description of Collateral:<br><br>☐ Real Estate   ☐ Motor Vehicle<br><br>☐ Other<br><br>Value of Collateral: $<br><br>Amount of arrearage and other charges <u>at time case filed</u> included in secured claim above, if any  $_____<br><br>☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. § 507(a)(7)<br><br>☐ Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8)<br><br>☐ Other — Specify applicable paragraph of 11 U.S.C. § 507(a)_____<br><br>*Amounts are subject to adjustment on 4/1/01 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| **5. Total Amount of Claim at Time Case Filed:**   Contingent/Unliquidated; | $_____    _____    _____    _____ |
|---|---|
| | (unsecured)    (secured)    (priority)    (Total) |

| | |
|---|---|
| **6.   Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>**7.   Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>**8.   Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and a copy of this proof of claim. | **THIS SPACE IS FOR COURT USE ONLY** |

| Date<br>DEC. 14, 2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach a copy of power of attorney, if any).<br><br>By _Marlene G. Colucci_<br>      Marlene M. Colucci | |
|---|---|---|

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

indebtedness, or so much thereof as may remain unpaid at the time, plus any earned and accrued interest and any other monetary obligations then due and owing, shall, at the option of the Payee/Holder, become immediately all due and payable; and payment of said principal indebtedness, or the balance thereof, and all interest thereon, together with any and all other sums due under the terms of the Note and mortgage instrument, and/or any other instrument given as collateral security for the obligation evidenced by this Note may be enforced and recovered at once, it being understood and agreed that time and performance are expressly made of the essence.

### Interest on Default

Should default be made in payment of any of the indebtedness evidenced hereby after the entire principal amount hereof shall have become due and payable, whether by acceleration, at maturity, or otherwise, the entire unpaid balance of that principal sum shall bear interest at the rate set forth in this note.

### Time of the Essence

It is understood that time and all performances are expressly and specifically of the essence.

### Waiver Provisions

The Maker, and any endorsers, guarantors, and/or sureties of this Note, and each of them, hereby waive diligence; demand; presentation for payment; notice of non-payment; dishonor; protest; and notice of any renewals or extensions of this Note, whether made to or in favor of the Maker, or any other person or persons. The pleading of any statute of limitations as a defense to any demand against the Maker, or any such endorsers, guarantors and/or sureties is expressly and specifically, knowingly and intelligently, voluntarily and explicitly waived by each and all of said parties, i.e. Maker, endorsers, guarantors and sureties.

Maker hereby expressly waives demand, presentation for payment, notice of dishonor, protest and notice of protest. This Note may not be changed or terminated, except by written agreement signed by the party against whom any enforcement of any change, modification, waiver or discharge is sought.

Wherever a waiver or release is given and/or provided by Maker in favor of Payee/Holder, it is understood that such waiver and/or release is given knowingly, voluntarily, intelligently, expressly and specifically and in the total absence of any fraud, mistake, coercion, undue influence, duress and/or confusion.

## Non-Waiver of Rights by Payee

Neither (i) the failure of Payee/Holder hereof to exercise its rights to accelerate this Note when such option shall be come available, nor (ii) any delay or omission on the part of the Payee/Holder hereof in exercising any right hereunder or any of the agreements referred to herein shall operate or be construed, deemed or understood as a waiver of such option and right or of any such other right hereunder or under the mortgage instrument or under said agreement of any of then, or in event a default has not been cured prior to the time of exercise of any such right by the Payee/Holder hereof.

By accepting payment of any sum due hereunder after it is due and owing, the Payee/Holder hereof shall not be deemed, construed, interpreted and/or understood to have waived its rights to require prompt payment when due of any and all other sums hereunder or to declare an event of default as herein provided for failure to make prompt payment. No delay or omission on the part of the Payee/Holder hereof in exercising any right under this Note or mortgage instrument, or nay other agreement referred to herein shall operate or otherwise be construed, interpreted, understood or otherwise deemed as a waiver of any such right.

## Default Provisions

Maker shall be deemed in default under the terms of this Note or mortgage instrument as referenced herein if any of the following events occur: (i) Maker fails to make any payment when due, (ii)_ Maker breaks any promise or breaches any covenant which Maker has made to Payee, or Maker fails to comply with or otherwise timely perform when due any other term, obligation, covenant, or condition contained in this Note, any mortgage instrument, or any other agreement related to this Note; (iii) Maker defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Maker's property or Maker's ability to repay this Note or perform Maker's obligations under this Note or any of the related documents as referenced herein, including any mortgage instrument; (iv) any representation or statement made or furnished to Payee by Maker or on Maker's behalf is false or misleading in any material respect, either now or at any time made or furnished; (v) Maker becomes insolvent, a Receiver is appointed for any part of Maker's property, Maker makes an assignment for the benefit of creditors, or any proceeding is commenced either by Maker or against Maker under any bankruptcy or insolvency laws; (vi) any creditor tries to take any of Maker's property on or in which Payee has a lien or security interest; (vii) a material adverse change occurs in Maker's financial condition; and (viii) any guarantor dies or any of the other events described in this default section occur with respect to any guarantor of this Note, provided, however, this "(viii)" provision shall not be applicable for purposes of declaring a default, breach, and/or nonperformance, should an on condition that within thirty (30) days of the death of any such guarantor the guarantor's personal representative, executor, or authorized representative of guarantor's estate delivers in writing to Payee/Holder notification unconditionally, absolutely, and irrevocably affirming, acknowledging, and agreeing that:

(a) the Note, any mortgage instrument or other security instrument executed pursuant to the terms hereof for the benefit of Payee and its assigns and successors, as referenced, described , and/or set forth in this Note, are in full force and effect and constitute legal, valid, binding, and enforceable obligations of the guarantor and its assigns and successors in accordance with and pursuant to its respective terms per said Note, mortgage/security instrument (s) and to which enforcement may be sought pursuant to the applicable state laws:

(b) there are no claims, counter claims, offsets, deductions, and/or defenses, or companion rights thereto, to the Maker's obligations as set forth in this Note and related mortgage/security documents;

(c) any claim, right, and/or remedy on and/or to which a disaffirmance and/or rejection of this Note and any companion mortgage/security instruments and/or documents, and the underlying obligations relating thereto, are expressly, specifically, knowingly, and voluntarily waived, including a waiver of any unknown, unsuspected, and/or unforeseen aspects or claims concerning and/or as a consequence of such waiver pursuant to California Civil Code s1542;

(d) any waivers given are understood to be unconditional, absolute, and irrevocable in all respects and shall be valid and legally binding the guarantor's estate and his representatives;

## Payees Remedies

All rights and remedies under this Note and mortgage instrument are understood to and shall be cumulative in effect with all other rights and remedies Payee/Holder has or may have in law, at equity, by virtue of the mortgage or security instrument, or otherwise. Failure by Payee/Holder to exercise any right or remedy at any particular time shall not be deemed, construed, interpreted or understood as a waiver of any such right or remedy, or any other rights or remedies.

## Attorneys Fees

In the event suit or action be instituted on this Note, or any attorney be employed or expenses be incurred to compel payment of this Note or any portion of the indebtedness evidenced hereby, or to defend the priority of the mortgage instrument, or as otherwise provided in the mortgage instrument, Maker promises and agrees to pay all such expenses and attorneys fees actually incurred by the Payee/Holder as a result thereof.

### Notices

Except as otherwise provided to the contrary herein, any notice herein required or permitted to be given shall be done so in writing and may be personally served or sent by mail to the addresses, and if by mail, shall be deemed to have been given when deposited in the United States mail, registered or certified, return receipt requested, with postage prepaid and properly addressed. Any such notice transmitted through the U.S. Mail shall be deemed effective within three (3) business days of dispatch to the addressee. For the purposes hereof, the addresses of the Maker and Payee (until notice of a change thereof is given as provided in this specific subparagraph) shall be as follows:

If to Maker:

Stockwell Properties, LLC
2934-1/2 Beverly Glen Circle
#390
Bel-Air, CA 90077

If to Payee:

Victor H. Colucci and Marlene M. Colucci
4267 Marina City Drive
#604/606
Marina Del Rey, CA

### Miscellaneous Provisions

Every provision in this Note is intended to be severable. In the event any provision of this Note shall be determined by a body of competent jurisdiction to be void, illegal, invalid, or unenforceable (collectively "Unenforceable"), the remaining terms and provisions of this Note shall not be affected thereby, and each of such remaining terms and provisions of this Note shall be valid and enforceable to the fullest extent permitted by law, unless a party demonstrates by a preponderance of the evidence that the Unenforceable provision was an essential economic or substantive and material term of this Note. This Note and its terms and any ambiguity which may exist or be discovered shall be equally and fairly interpreted by and between Maker and Payee and without reference to the party who prepared or caused to be prepared this Note. To the extend required, Maker hereby waives and releases any rights, privileges, benefits and/or claims under California Civil Code s1654 or any amended or successor statute thereto.

### Allocation of Payments

Payments made per the terms of this Note shall be credited first to interest, then to principal, and then to any other costs, fees or expenses due and owing under this Note. Principal, interest, charges, costs and expenses are payable in lawful money fo the United States of America.

## Governing Law and Venue

This Note has been delivered to Payee and accepted by Payee in the County of Los Angeles, State of California. This Note shall be governed by, construed and interpreted in accordance with California law. If a lawsuit is filed, Maker agrees upon Payee's request to submit to the jurisdiction of the Courts of Los Angeles County, State of California. Maker and Payee expressly and specifically waive the right to any jury trial in any action, proceeding, cross-complaint, or counter claim brought by either Payee or Maker against the other.

Binding Effect

The terms of this Note shall be binding upon, inure to the benefit and applied to all parties and their respective heirs, legatees, devisees, administrators, personal representatives, executors, successors in interest and assigns.

## Collateral Security Performances and Repayment

This Note is secured by:

(i)    The above referenced mortgage instrument to and in favor of (title company), as Trustee, and recorded against that certain unimproved real property located in the County of (Ventura, California) commonly known as and located at 3970 Brunston Court, Thousand Oaks, CA 91362

STOCKWELL PROPERTIES, LLC

Curtis Somoza, Manager

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Victor H. Colucci
Marlene M. Colucci
4267 Marina City Drive, Unit 604/606
Marina Del Rey, CA 90292



20050822-0208255
Pages: 2    Fees: $14.00
08/22/2005 12:27:28 PM
T20050071939 FO
Ventura County Recorder
Philip J. Schmit

SPACE ABOVE THIS LINE IS
FOR RECORDER'S USE

### DEED OF TRUST

This Deed Of Trust dated August 17, 2005 relates to Stockwell Properties, LLC, a California Limited Liability Company (herein called TRUSTOR, whose address are Stockwell Properties 3970 Brunston Court, Westlake Village, California 91362); Chicago Title Company (herein called TRUSTEE); and Victor H. Colucci and Marlene M. Colucci (herein called BENEFICIARY).

For the purpose of securing the Promissory Note dated April 30, 2005 in the amount of $600,000, TRUSTOR grants to TRUSTEE in trust, with power of sale, the Property commonly known as 3970 Brunston Court, Westlake Village, County of Ventura, State of California, described as:

Lot 1 of Tract No. 4023, as per map recorded in Book 105, Page(s) 62-68 of Maps, in the Office of the County Recorder of Ventura County, State of California. Excepting therefrom all oil, gas and other hydrocarbon substances and other minerals lying below a depth of 500.00 feet with no rights of surface entry in said property.

In the event TRUSTOR sells the property described herein, all sums then owing under the Note secured hereby shall become immediately due and payable. Nothing in this instrument shall in any way restrict or limit TRUSTOR's right to execute other deeds of trust recorded before or after this Deed of Trust.

Signature of Trustor:

Stockwell Properties, LLC, a California
Limited Liability Company

By: _____

Curtis D. Sornoza, Managing Member

1

STATE OF CALIFORNIA
COUNTY OF VENTURA
On Aug 11, 2005 before me TESSA HOTTINGER
a Notary Public in and for said County and State,
personally appeared Curtis D. Somoza, proved to me on the basis
of satisfactory evidence to be the person whose name is subscribed
to the within instrument and acknowledged to me that
he executed the same in his authorized capacity and
that by his signature on the instrument the entity upon
behalf of the person acted executed the instrument.
WITNESS my hand and official seal.

Signature: _____
                    Notary Public

TESSA HOTTINGER
Commission # 1331255
Notary Public - California
Ventura County
My Comm. Expires Nov 20, 2005

2

**"EXHIBIT 3"**

# RUS, MILIBAND & SMITH

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

CITICORP PLAZA, 2600 MICHELSON DRIVE, SEVENTH FLOOR
IRVINE, CALIFORNIA 92612
TEL 949.752.7100 FAX 949.252.1514
WWW.RUSMILIBAND.COM

RONALD RUS
JOEL S. MILIBAND
RANDALL A. SMITH
LAUREL R. ZAESKE
LEO J. PRESIADO
D. EDWARD HAYS
CATHRINE M. CASTALDI
M. PETER CRINELLA
JAME P. MASCARO

OF COUNSEL
PATRICK K. McCLELLAN

WRITER'S E-MAIL
LZAESKE@RUSMILIBAND.COM

REFERENCE NUMBER
2161-0018

April 9, 2008

Marlene M. Colucci
4267 Marina City Drive
Unit 604/606
Marina Del Rey, California 90292

Re:     *In re Stockwell Properties, LLC*
        USBC Case No. 2:05-28700 AA (the "Stockwell Bankruptcy Case")

Dear Ms. Colucci:

This firm is assisting Helen Frazer, the Chapter 7 Trustee (the "Trustee") in the above referenced bankruptcy case, in reviewing the claims filed in the Stockwell Bankruptcy Case. The Bankruptcy Court files reflect that you have filed a proof of claim for $600,000, which has been assigned Claim No. 25. A copy of your claim is enclosed for your reference.

The Stockwell banking records do not reflect that Stockwell received $600,000 from you in April 30, 2005, as reflected in your proof of claim. Can you please provide additional support that the funds were actually advanced to, or for the benefit of, Stockwell.

Should you have any questions regarding the above, please feel free to give me a call.

Very truly yours,

RUS, MILIBAND & SMITH
A Professional Corporation

LAUREL R. ZAESKE

Enclosures
cc:    Helen Frazer, Trustee (w/o encl.)

**"EXHIBIT 4"**

# A K I N   G U M P
# S T R A U S S   H A U E R   &   F E L D LLP

■■■■■■■■■■■ Attorneys at Law

STANLEY J. SAMORAJCZYK
202.887.4002/fax: 202.887.4288
ssamorajczyk@akingump.com

April 23, 2008

VIA FACSIMILE

Laurel R. Zaeske
Rus, Miliband & Smith
Citicorp Plaza
2600 Michelson Drive, 7th Floor
Irvine, CA 92612

Re:  *In re Stockwell Properties, LLC*
     USBC Case No. 2:05-28700 AA (the "Stockwell Bankruptcy Case")

Dear Ms. Zaeske:

Our client, Marlene M. Colucci, has forwarded a copy of your April 9 letter regarding her claim in the Stockwell bankruptcy case, *In re Stockwell Properties, LLC,* and we are reviewing her file with her. As you are no doubt aware, the Coberly-Somoza Ponzi scheme was quite complex. We will be responding to your letter on behalf of our client in the very near future.

Sincerely,

Stanley J. Samorajczyk

cc:    Mrs. Marlene M. Colucci
       Marlene Colucci, Esq.
       Peter Gurfein, Esq.

Robert S. Strauss Building / 1333 New Hampshire Avenue, N.W. / Washington, D.C. 20036-1564 / 202.887.4000 / fax: 202.887.4288 / www.akingump.com

**"EXHIBIT 5"**

**Laurel R. Zaeske**

| | |
|---|---|
| **From:** | Helen R. Frazer [HFrazer@aalrr.com] |
| **Sent:** | Monday, November 16, 2009 12:24 PM |
| **To:** | Laurel R. Zaeske |
| **Subject:** | Fwd: Stockwell Bankruptcy - from Marlene Colucci (via Michele Colucci, formerly Zieger) |

Sent from my iPhone

Begin forwarded message:

**From:** Michele Colucci <michele@mylawsuit.com>
**Date:** November 16, 2009 2:11:39 PM CST
**To:** "Helen R. Frazer" <HFrazer@aalrr.com>
**Cc:** 'Hugh Robertson' <hdr@robertsonlum.com>
**Subject: Stockwell Bankruptcy - from Marlene Colucci (via Michele Colucci, formerly Zieger)**

Dear Helen,

I recently received, by mistake, a contract signed by my "soon to be ex-husband" – we've been separated and going through a divorce since December of 2007, with Bruinbilt.

It seems that he gave a claim in the Stockwell bankruptcy to Bruinbilt.

I am wondering if that's my mother's claim...she is a widow (my father died four years ago) and we have had trouble locating the funds my ex husband has supposedly invested on behalf of my mother. If it is in fact our claim, it would be marital property of course and the claim does not belong to him alone nor does he have my power of attorney to make any deal on my behalf.  When Ari filed for divorce and a restraining order in June of 2008 to try to prevent us from moving out of the LA area (unsuccessful), it took me eight months to get him in to court and pin him down to some small amount of child support. Needless to say, he has been less than forthcoming in all of the things he's been up to.

I moved up to Northern California with our three boys in June of 2008 and my mother has had to give her beautiful condo back to the bank thanks to Ari's actions in losing her life savings.

My parents had a note secured against Kurt Somoza's house in Beverly Hills – for 600,000. – that we can't find.

To my knowledge, that was the only claim in Stockwell any of us had.

Can you give me some information surrounding this deal - as he does not have the power of attorney to give anything away on her behalf!

Thanks for your assistance in this continuing financial and emotional debacle.

With Kind Regards,

Michele

---
**Michele A. Colucci, Esq.**
MyLawsuit.com
2995 Woodside Road - Suite 400

1

Woodside, CA 94062
Tel: (323) 389-1809 Ext. 1
Fax: (650) 530-2224
http://www.mylawsuit.com

2

**"EXHIBIT 6"**

**Laurel R. Zaeske**

| | |
|---|---|
| **From:** | Laurel R. Zaeske |
| **Sent:** | Wednesday, November 18, 2009 3:11 PM |
| **To:** | 'michell@mylawsuit.com' |
| **Cc:** | Joel S. Miliband |
| **Subject:** | FW: Stockwell Bankruptcy - from Marlene Colucci (via Michele Colucci, formerly Zieger) |

Michele,

I represent Helen Frazer in the Stockwell Bankruptcy Case. Ms. Frazer forwarded to me your email for response. Please give me a call at your convenience to discuss the issues raised in your email below. In advance of your call, you might want to review the creditor claims docket in the Stockwell Bankruptcy Case and in particular, review the claims filed by Marlene Colucci for $600,000 and the 2 claims filed by Ari Zieger.

Thank you, Laurel

Laurel R. Zaeske, Esq.
Rus, Miliband & Smith, APC
2211 Michelson Dr., Suite 700
Irvine, California 92612
(949) 752-7100
lzaeske@rusmiliband.com

Confidentiality Note: This e-mail and any attached documents contain information which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this e-mail. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this e-mail information, is strictly prohibited and that the documents should be returned to Rus, Miliband & Smith immediately. In this regard, if you have received this e-mail in error, please notify us by return e-mail or telephone (949-752-7100) immediately. Please delete the e-mail and all attachments and destroy all hard copies of same.

**From:** Michele Colucci <michele@mylawsuit.com>
**Date:** November 16, 2009 2:11:39 PM CST
**To:** "Helen R. Frazer" <HFrazer@aalrr.com>
**Cc:** 'Hugh Robertson' <hdr@robertsonlum.com>
**Subject: Stockwell Bankruptcy - from Marlene Colucci (via Michele Colucci, formerly Zieger)**

Dear Helen,

I recently received, by mistake, a contract signed by my "soon to be ex-husband" – we've been separated and going through a divorce since December of 2007, with Bruinbilt.

It seems that he gave a claim in the Stockwell bankruptcy to Bruinbilt.

I am wondering if that's my mother's claim...she is a widow (my father died four years ago) and we have had trouble locating the funds my ex husband has supposedly invested on behalf of my mother. If it is in fact our claim, it would be marital property of course and the claim does not belong to him alone nor does he have my power of attorney to make any deal on my behalf. When Ari filed for divorce and a restraining order in June of 2008 to try to prevent us from moving out of the LA area (unsuccessful), it took me eight months to get him in to court and pin him down to some small amount of child support. Needless to say, he has been less than forthcoming in all of the things he's been up to.

I moved up to Northern California with our three boys in June of 2008 and my mother has had to give her beautiful condo back to the bank thanks to Ari's actions in losing her life savings.

My parents had a note secured against Kurt Somoza's house in Beverly Hills – for 600,000. – that we can't find.

1

To my knowledge, that was the only claim in Stockwell any of us had.

Can you give me some information surrounding this deal - as he does not have the power of attorney to give anything away on her behalf!

Thanks for your assistance in this continuing financial and emotional debacle.

With Kind Regards,

Michele

--

**Michele A. Colucci, Esq.**
MyLawsuit.com
2995 Woodside Road - Suite 400
Woodside, CA 94062
Tel: (323) 389-1809 Ext. 1
Fax: (650) 530-2224
http://www.mylawsuit.com

2

**"EXHIBIT 7"**

**Laurel R. Zaeske**

| | |
|---|---|
| **From:** | Rothschild, Brian [brothschild@akingump.com] |
| **Sent:** | Wednesday, June 09, 2010 6:19 PM |
| **To:** | Sara A. Maunder; Laurel R. Zaeske |
| **Cc:** | 'Peter J. Gurfein'; 'mcolucci@ahla.com' |
| **Subject:** | Stockwell Properties |
| **Attachments:** | Colucci-Letter re Stockwell Claim.pdf; Colucci - Promissory Note and Recorded Deed.pdf |

Dear Laurel:

Attached please find a letter and exhibits providing additional support for Ms. Colucci's claim against Stockwell Properties.

Best regards,

Brian

Brian Rothschild | Financial Restructuring
Akin Gump Strauss Hauer and Feld LLP | 2029 Century Park East St. 2400 Los Angeles, CA 90067 |
direct: 310.728.3734 | direct fax: 310.229.1001 | brothschild@akingump.com |
http://www.akingump.com | Google Voice all-purpose locator: 310.876.2299

IRS Circular 230 Notice Requirement: This communication is not given in the form of a
covered opinion, within the meaning of Circular 230 issued by the United States Secretary
of the Treasury. Thus, we are required to inform you that you cannot rely upon any tax
advice contained in this communication for the purpose of avoiding United States federal
tax penalties. In addition, any tax advice contained in this communication may not be
used to promote, market or recommend a transaction to another party.

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above. If you have received this communication
in error, please notify us immediately by e-mail, and delete the original message.

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
Attorneys at Law

Settlement Communications - Subject to FRE rule 408

Brian M. Rothschild
310.728.3734/fax: 310.229.1001
brothschild@akingump.com

June 9, 2008

VIA EMAIL

Laurel R. Zaeske
Rus, Miliband & Smith
Citicorp Plaza
2600 Michelson Drive, 7th Floor
Irvine, CA 92612

  Re: *In re Stockwell Properties, LLC*; Claim No. 25 of Marlene M. Colucci

Dear Laurel:

  This is in response to your recent letter to our client, Mrs. Marlene M. Colucci, and conversations among you, Peter Gurfein, and Sara A. Maunder, and me, in which your firm requested additional support showing that Ms. Colucci's funds were advanced to or for the benefit of Stockwell in exchange for the Secured Promissory Note (Straight Note) and recorded Deed of Trust, copies of which are attached for your convenience.

  In response to your inquiry we are also enclosing copies of the following additional evidence:

  1. Portions of the Rule 2004 Examination of Curtis D. Samoza of October 12, 2005, in the Stockwell Case:

  • On page 124 Samoza, acknowledges the Deed of Trust on the Branston Court residence in favor of Victor Colucci, our client's late husband, in the amount of $600,000.

  • On pages 138 through 142 Samoza acknowledges the Colucci debt of $600,000, **that Stockwell received the funds from the Coluccis in the amount of approximately $550,000 to $600,000**, and that the funds were used for construction costs on Wallingford, another residential property owned by Stockwell.

  2. Pages 7 and 8 of Exhibit 2 to the Plea Agreement For Defendant Robert A. Coberly, Jr., in U.S. v. Robert A. Coberly, Jr., CR No. 06-479-AHM, U.S. District Court for the Central District of California.

6465568

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Laurel R. Zaeske
June 9, 2008
Page 2

The Plea Agreement describes, in detail, how Samoza and Coberly used the vast majority of investors' funds to make Ponzi payments to investors and buy luxury houses, etc. Paragraph 17 of the Plea Agreement states that Samoza used $17 million to purchase the residence on Branston Court in Westlake Village and that he transferred $4,621,000 of investors' monies to Stockwell.

The foregoing establishes that Stockwell received approximately $600,000 from the Coluccis as asserted in Claim No. 25.

This information is provided in response to your inquiry but is not intended to preclude the use or admission of additional evidence to support Claim No. 25 in any subsequent controversy.

Sincerely,

Brian M. Rothschild

cc:   Marlene M. Colucci
      Sara A. Maunder, Esq.
      Peter J. Gurfein, Esq.

```
                              Somoza101205.txt
 1                   UNITED STATES BANKRUPTCY COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

 3

 4

 5     In Re:                      ) Case No. LA 05-28700-AA
                                   )
 6                                 )
                                   )   Volume I
 7                                 )   (Pages 1 to 157)
                                   )
 8     STOCKWELL PROPERTIES, LLC,  )
                                   )
 9                                 )
                                   )
10                                 )
                                   )
11              Debtor.            )
       _____)
12

13

14

15

16                   RULE 2004 EXAMINATION

17                     CURTIS D. SOMOZA

18              Wednesday, October 12, 2005

19                    Encino, California

20

21

22

23

24     Reported by:

25     CHERYL A. MARTIN
       CSR NO. 4974
```

                                                              1

```
 1
                    UNITED STATES BANKRUPTCY COURT
 2
           CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION
 3

 4
```

                            Page 1

Somoza101205.txt

5
6   In Re:                                    ) Case No. LA 05-28700-AA
7                                             )
8                                             )
    STOCKWELL PROPERTIES, LLC,                )
9                                             )
10                                            )
11          Debtor.                           )
    ————————————————————————————————————————)
12

13

14

15

16      RULE 2004 EXAMINATION AND DEPOSITION OF PERSON MOST

17   KNOWLEDGEABLE OF STOCKWELL PROPERTIES, LLC, CURTIS

18   SOMOZA, taken on behalf of Secured Creditor, The Charles

19   Burtzloff Living Trust, at 16633 Ventura Boulevard, Suite

20   800, Encino, California, commencing at 10:52 a.m. on

21   Wednesday, October 12, 2005, before Cheryl A.

22   Martin,California Certified Shorthand Reporter No. 4974.

23

24

25

                                                        2

1   APPEARANCES OF COUNSEL:

2   FOR SECURED CREDITOR, THE CHARLES BURTZLOFF LIVING TRUST:

3          PLOTKIN, RAPOPORT & NAHMIAS
           BY:   ALAN I. NAHMIAS, ESQ.
4          16633 Ventura Boulevard, Suite 800
           Encino, California 91436-1836
5          Telephone:  (818) 906-1600
           Facsimile:  (818) 907-9261
6

7   FOR ALLEGED DEBTOR:

8          ROBINSON, DIAMANT & WOLKOWITZ
           BY:   ROBYN B. SOKOL, ATTORNEY AT LAW
                        Page 2

```
 9                      Somoza101205.txt
                 1888 Century Park East, Suite 1500
10               Los Angeles, California 90067
                 Telephone:  (310) 277-7400
11               Facsimile:  (310) 277-7584

12      FOR PETITIONING CREDITOR ZIEGER:

13          LINER, YANKELEVITZ, SUNSHINE & REGENSTREIF, LLP
            BY:   SAM A. KOZHAYA, ESQ.
14          1100 Glendon Avenue, 14th Floor
            Los Angeles, California 90024
15          Telephone:  (310) 500-3500
            Facsimile:  (310) 500-3501
16

17      FOR CHEVY CHASE BANK:

18          PITE, DUNCAN & MELMET, LLP
            BY:   ROBERT M. RUBEN, ESQ.
19          1820 E. First Street, Suite 420
            Santa Ana, California 92705
20          Telephone:  (714) 285-2639
            Facsimile:  (714) 285-2668
21

22

23      ALSO PRESENT:  Charles Burtzloff
                       Esrom Jayasinghe, Verbatim Video
24

25
```

                                                                  3

```
 1                      I N D E X

 2   WITNESS               EXAMINATION              PAGE

 3   Curtis Somoza

 4                    By Mr. Nahmias                   7

 5

 6

 7                   DEPOSITION EXHIBITS

 8   NUMBER           DESCRIPTION              PAGE

 9   1     Notice of Motion and Motion of Secured
           Creditor Charles Burtzloff to take      14
10         Videotaped Examination of Person Most
           Knowledgeable
11

12   2     Notice of Motion and Motion of Secured
           Creditor Charles Burtzloff to take      15
           Videotaped Examination of Curtis D.
```
                        Page 3

Somoza101205.txt
13      Somoza

14    3    Order Granting Motion of Secured Creditor           15
15         Charles Burtzloff for Videotaped
           Examination of the Person Most
16         Knowledgeable of Debtor, Stockwell
           Properties

17    4    Order Granting Motion of Secured Creditor           16
18         Charles Burtzloff for Videotaped
           Examination of Curtis D. Somoza

19    5    Involuntary Petition In Re. Stockewell              17
20         Properties, LLC

21    6    Answer to Involuntary Petition                      87

22    7    Stockwell Properties Payables 10/8/2005             92

23    8    Equity Title                                       125

24    9    Deed of Trust 20040702-0185565                     127

25    10   Customer Supplemental Report dated                 137
           August 1, 2005

4

◻         1    DEPOSITION EXHIBITS (continued)

2    11   Appraisal of Real Property at 3970                 145
3         Brunston Court, Thousand Oaks

4

5

6              QUESTIONS INSTRUCTED NOT TO ANSWER

7                     PAGE     LINE

8                      30       10
9                     117       20

10

11

12              INFORMATION TO BE SUPPLIED

13                    PAGE LINE

14                     61       2
                       62      15
15                     84      21
                      107       1
16

Page 4

Somoza101205.txt

17
18
19
20
21
22
23
24
25

5

1          ENCINO, CALIFORNIA; WEDNESDAY, OCTOBER 12, 2005

2                          10:52 A.M.

3

4

5          THE VIDEOGRAPHER:  We are on the record.

6              This is the Rule 2004 Examination of Curtis

7      Somoza taken on behalf of the creditor, In Re Stockwell

8      Properties, LLC, pending before the United States

9      Bankruptcy Court, Central District of California,

10     Case No. LA0528700AA.

11             It is Wednesday, October 12, 2005.  We are at

12     16633 Ventura Boulevard, Suite 800 in Encino, California.

13             My name is Esrom Jayasinghe of Verbatim Video

14     located at 9725 Gladbeck Avenue in Northridge,

15     California.

16             This is the start of Tape 1.  The time now is

17     10:52.

18             And, Counsel, if you'd kindly introduce

19     yourselves and state your affiliations, please.

20         MR. NAHMIAS:  Alan Nahmias, N-a-h-m-i-a-s, of

Page 5

Somoza101205.txt

12    Q    So Stockwell may or may not have claims against

13   Mr. Parada and/or Mr. Zieger in conjunction with whatever

14   damage you assert was caused?

15    A    Correct.

16   MR. NAHMIAS:  He and I both understand.

17   MS. SOKOL:  I understand.  I'm just --

18   BY MR. NAHMIAS:

19    Q    Have you -- what was the most recent

20   conversation you conducted with Mr. Coberly on this

21   matter?

22    A    On this matter.  I probably have not discussed

23   anything regarding this in a week.

24    Q    It's been at least a week?

25    A    Probably within a week.  Sometime last week.  It

122

1   could have been Friday, but sometime during the week last

2   week.

3    Q    Who is Mr. Coberly's lender that he's proposing

4   to bring in?

5    A    I have the names.  I don't pay a lot of

6   attention to it, but he's mentioned them.  It's the same

7   name over and over that he has.

8    Q    And you think he's that fearful of Stockwell's

9   claims that he's prepared to go out and personally sign

10   as a guarantor on a loan of several million dollars?

11    A    I don't believe he's fearful so much of the

12   Stockwell claims, but there's too much that me being an

13   adversary of him would cause him far more damage than any

14   amount I could recover in a court for this action.

15    Q    When you say "you" being an adversary, are you

Page 107

Somoza101205.txt

16    talking about you personally?

17       A   Yes.

18       Q   Has he discussed with you Persistence -- the

19    filing by Persistence of its Chapter 11?

20       A   As a consultant of Persistence, I do get updates

21    on what's going on.  He did tell me about it.  That's

22    really about all I know of it.

23       Q   Were you consulted about it prior to the

24    filing?

25       A   I was informed of it, not consulted of it, but I

123

1    was informed of it.  The consulting I do for them is

2    regarding the business of the insurance in determining

3    who you insure at what price.  That's what I consult with

4    Persistence for.

5       He informs me almost as a courtesy as to what's

6    going on with Persistence.

7       Q   Are you a paid consultant?

8       A   No.

9       Q   Have you had any conversations with Mr. Zieger

10    about resolving his claims since the filing of the

11    Involuntary?

12       A   No.  Not -- I mean, I have had conversations

13    with Mr. Zieger.  We really haven't touched upon this too

14    much.  Even in the amount claimed, it's not a -- no.  I

15    haven't had any discussions with him.

16       Q   Are you aware as to whether or not your counsel

17    has had any conversations with either any of these

18    parties or counsel for any of these parties regarding the

19    settlement of their claims?

Page 108

Somoza101205.txt

20      A    I'm not aware.

21      Q    What obligations are secured -- what obligations

22  of Stockwell are secured by the Brunston property?

23      A    What do you mean by "obligations"?

24      Q    What indebtedness?

25      A    As far as the secured liens on the property?


                                                        124

1      Q    Yes.

2      A    Chuck Burtzloff has a 13.6 first trust deed on

3  the property.  There is a second -- Swedo & Jones.  Mike

4  Swedo, I think, and Scott Jones -- for 700,000.  Collucci

5  for 600,000.

6      Q    Who was the last one?

7      A    Collucci for 600,000.

8      Q    Who is Collucci?  Does Collucci have a first

9  name?

10      A    Victor, I believe.  I can get that for you.  I

11  mean, it's a recorded note.  It's on the pay offs.

12          There's the property taxes that are --

13      MS. SOKOL:  Hold on.  Do you want me to hand you --

14      THE WITNESS:  Is it on the prelim?

15      MS. SOKOL:  I think they were stapled together.  I

16  have a preliminary title report I can hand him.  That

17  way --

18      THE WITNESS:  Do you want me to go --

19      MR. NAHMIAS:  Sure.

20      MS. SOKOL:  Rather than have him --

21      MR. NAHMIAS:  Sure.  I have -- I can give it to you.

22  I have certain things.  Certain things I don't have that

23  you're referencing.

                    Page 109

Somoza101205.txt

24          (Discussion off the record.)

25          (Whereupon Exhibit 8 was marked for

125

1          identification and is attached hereto.)

2          MR. NAHMIAS:  Why don't we mark the ones that you

3     don't get and we'll copy them when we're done.

4          MS. SOKOL:  Here.

5          MR. NAHMIAS:  I think we're going to be short one for

6     perhaps the balance of what I've got here.  I'm not sure.

7          Q    Take a look, if you would --

8          MS. SOKOL:  Just the deed of trust.

9          MR. NAHMIAS:  Yeah.  It's just the deed of trust.

10         MS. SOKOL:  Oh, okay.  I thought you wanted him to go

11    through all the liens first.

12         MR. NAHMIAS:  If -- well, let's take them one at a

13    time and he can refer to that document.

14         MS. SOKOL:  Okay.  That's fine.

15    BY MR. NAHMIAS:

16         Q    The second to the last page of Exhibit 8, do you

17    see a signature in about the middle of the page there?

18         A    Yes.

19         Q    Is that your signature?

20         A    I believe so.

21         Q    Appears to be?

22         A    It appears to be.

23         Q    Do you recall signing a deed of trust in favor

24    of the Burtzloff Living Trust?

25         A    Yes, I do.

Page 110

Somoza101205.txt

126

1       MR. NAHMIAS:  Let's look next at what we'll call
2   Exhibit 9.

3           This is a Deed of Trust instrument No.
4   20040702-0185565, two pages.

5           (Whereupon Exhibit 9 was marked for
6           identification and is attached hereto.)
7   BY MR. NAHMIAS:

8       Q    The bottom of Page 1, is that your signature?
9       A    I believe so.

10      Q    And the parties in the upper left-hand corner,
11  same parties referenced in the first paragraph, Mike
12  Swedo and Scott Jones?

13      A    Yes.

14      Q    Who are those two individuals?

15      A    They're lenders.

16      Q    Hard money lenders?

17      A    Yes.

18      Q    How much do you assert that Stockwell owes Swedo
19  and Jones?

20      A    I believe it's 700,000 now.  The current -- the
21  last payoff I saw was 700,000.

22      Q    Was it ever 1.5 million?

23      A    Yes.

24      Q    It's been paid down?

25      A    It was a cross collateralized guarantee.  There

127

1   was no note to this.  The deed of trust was a business
2   guarantee.

3       Q    So Stockwell guaranteed --

Page 111

Somoza101205.txt

4     A     Yes.

5     Q     -- somebody else's obligation?

6     A     Yes.

7     Q     Whose obligation did Stockwell guarantee?

8     A     My obligation.

9     Q     Your personal obligation.  Not your trust, but

10    you personally?

11    A     Correct.

12    Q     In conjunction with what?

13    A     I'm not sure what deal it was, but there was

14    some deal that we had a $1.5 million guarantee, which now

15    it's down to 700,000.

16    Q     So then you would personally still owe Swedo and

17    Jones this $700,000?

18    A     Yes.

19    Q     Is that obligation or indebtedness current?

20    A     There were no payments due on it.  It is due

21    upon paying it.

22    Q     Term-free loan?

23    A     Essentially.  It wasn't a loan.  It was a

24    guarantee.

25    Q     You guaranteed --

128

1     A     If I -- in order to get rid of the guarantee, I

2     have to pay this -- I have to give them cash or I can

3     give them another property, put the guarantee on.

4     Q     So --

5     A     It not a loan.

6     Q     I understand.

7           Stockwell guaranteed your guarantee?

Page 112

Somoza101205.txt

8      A    Stockwell allowed me to pledge, or to put a

9    trust deed, or deed of trust, on Brunston for, not a

10    debt, but for a guarantee.

11      Q    It collateralized your guarantee?

12      A    Yes.

13      Q    What was your guarantee for?  There was an

14    underlying obligation that apparently you guaranteed?

15      A    I guaranteed a business obligation.

16      Q    Of?

17      A    Of Persistence.

18      Q    Okay.  So Persistence is the party that is

19    indebted to Swedo and Jones?

20      A    I don't believe so anymore.  When we had this

21    separation -- that's why it's only 700,000.  I took on

22    the obligation so it's now --

23      Q    So it's no longer a guarantee of an obligation

24    but an actual obligation?

25      A    It's an obligation of me to pay 700,000 to Mike


                                                            129

1    Swedo and Scott Jones.  Again, you're using terminology

2    here --

3      Q    I'm not trying to confuse you.  I'm trying --

4      MS. SOKOL:  So it's on obligation of Curt Somoza

5    personally to pay Swedo --

6      THE WITNESS:  Mike Swedo and Scott Jones.

7      MS. SOKOL:  And it's secured by --

8      THE WITNESS:  By the Brunston property.

9    BY MR. NAHMIAS:

10      Q    Okay.

11      A    No interest due.  No due date.

                        Page 113

Somoza101205.txt

12    Q   Understood.

13    A   Basically, if they want -- if I want to put a
14  new loan on, they have to get paid off. That's
15  essentially the deal.

16    Q   There's no requirement that they subordinate or
17  anything like that?

18    A   Only if it's for less than the amount that I
19  already have. If I put a new 13.6 on, although this has
20  caused a lot of tension now, I could probably get them to
21  go back and put it behind another 13.6, although that's
22  not what I'm doing.

23    Q   Are Swedo and/or Jones friends of yours?

24    A   No.

25    Q   How did you come to meet Swedo and Jones?

130

1    A   Through Bob Coberly.

2    Q   And their original loan was made to Persistence,
3  is that correct, or their investment? You tell me.

4    A   Again, that action, I don't recall. I'm not
5  trying to mislead. I don't recall.

6    Q   Okay.

7    A   I believe the loan was actually made to me
8  personally. I believe the loan was made to me
9  personally, but I do not recall how that was --

10    Q   So Persistence may actually not play any part at
11  all in this?

12    A   I know they don't now, but I believe when we
13  actually -- when this deal was set up, they actually
14  loaned me personally the money.

15    Q   Swedo and Jones?

Page 114

Somoza101205.txt

16      A    Yes.

17      Q    Okay.

18           Then did you, in turn, give or loan any of it to

19      Persistence?

20      A    Possibly.  I don't recall and I don't want to

21      state that.

22      Q    How did it come that you ended up with 700,000

23      of it?

24      A    That, I believe, was the amount left due that

25      they have not been paid back.  See, they never loaned

                                                        131

1       1.5.

2       Q    They never loaned 1.5?

3       A    No.  It was for -- they wanted a guarantee of

4       1.5.  I agreed to that, but they --

5       Q    How much did they loan?

6       A    I believe 800,000.  We could spend an hour on

7       this and, again -- if I had all the -- I could go back

8       and get more specific on how this whole thing came up,

9       but this was not a straightforward loan.

10      Q    Was it a loan at all or was it an investment?

11      A    Again, I believe it was a loan to me -- no.

12      Actually, I don't recall how -- I'm trying to think.

13      Q    There was no note?

14      A    There was no note so it wasn't a loan.

15      Q    They just handed you the money?

16      A    I believe it was cross collateralized.  I'm

17      trying to remember.  This was a cross collateralization

18      for, I think, an investment in Persistence.

19           MS. SOKOL:  Do you have any documentation in your

                            Page 115

Somoza101205.txt

20    office other than this deed of trust regarding this

21    transaction?

22        THE WITNESS:  No.

23        MS. SOKOL:  This is all you have?

24        THE WITNESS:  That's all I have on it.  These

25    are Bob's father's best friends and they did something.


132

1    I'm not quite sure, and somehow -- there was a note

2    recorded for a million and a half on both my property and

3    Robert Coberly's property.

4    BY MR. NAHMIAS:

5        Q    A deed of trust?

6        A    A dead of trust.  Sorry.  A deed of trust on

7    both my property and Bob Coberly's property.  All I know

8    is however it ended up right now, I've got to give these

9    guys 700 grand to take their note off my property.  I

10    don't know what got it to that point, but that's what it

11    takes for me to get rid of them.

12        Q    And you don't dispute it?

13        A    It's what I'm --

14        Q    Stockwell doesn't dispute it?

15        A    Stockwell doesn't dispute it because they agreed

16    to do it.  So I can't dispute it.

17            I have a dispute with Bob against this.  This

18    is, again, where we have a lot of disputes over this is,

19    "why am I stuck with this?"

20        Q    Is there something in writing between you and

21    Stockwell acknowledging that Stockwell agreed to this?

22        A    I don't recall.  I can look for something like

23    that.

Page 116

Somoza101205.txt

24    Q    That would be helpful.

25    A    Okay.

133

1     Q    If you can furnish it by Monday if, in fact, you

2     come up with it.

3     A    Yeah.

4     Q    Had Swedo and Jones called or attempted to

5     commence foreclosure proceedings in connection with their

6     note?

7     A    No.

8     Q    Have you been in contact with either of them

9     since the filing of the Involuntary?

10    A    No.  I have not talked to them since whenever

11    this was filed a year and a half or so ago.

12    Q    How much does Stockwell assert it owes Burtzloff

13    at this point?

14    A    I believe the current pay off is 14 million and

15    change.

16    Q    Is that disputed at all by Stockwell?

17    A    13.6 plus interest clearly is not.  There are

18    some other fees, that I don't know if they're disputed or

19    not, but I don't think are proper.

20    Q    But the principle plus accrued interest is not

21    disputed in any way?

22    A    No.

23    Q    If any other portion of the last figure you had,

24    the pay off figure, is disputed could you furnish me with

25    what the disputed portions are?

Page 117                                    134

Somoza101205.txt

1      A    I'd have to see what the latest pay off number

2    is and then --

3      Q    Certainly.  If I get you that --

4      A    Yes.

5      Q    Okay.

6      MS. SOKOL:  Yes.  We don't have it right now.

7    BY MR. NAHMIAS:

8      Q    I assumed there was one for the foreclosure so

9    it was ready to go.

10     A    Yeah.  There was a pay off at that time.

11     Q    We can update it for you.

12     A    Yes, please.

13     Q    You started to tell me there was a -- I guess it

14    would be a third priority deed of trust secured by

15    Brunston.

16     A    Yes.

17     MS. SOKOL:  I don't think I've seen any documentation

18    on it.  What do you --

19     THE WITNESS:  On the preliminary title report it

20    lists them.

21     MS. SOKOL:  I provided that to you.  Let me find it.

22    I have an extra copy.

23     MR. NAHMIAS:  I have --

24     MS. SOKOL:  It was sent over in the packet.

25     MR. NAHMIAS:  Not with this because this came --

135

1          Let's go off the record.

2     THE VIDEOGRAPHER:  Off record at 3:33.

3          (Discussion off the record.)

4     THE VIDEOGRAPHER:  On record at 3:39.
                    Page 118

Somoza101205.txt

5    MR. NAHMIAS:  We're going to deviate for a moment

6  from where we were.  I'm going to hand back to Ms. Sokol

7  original files that were presented to me which contain,

8  basically, invoices relating to maintenance and/or other

9  improvements done at the -- both the Wallingford and the

10  Brunston Court property.

11         These were produced in partial compliance of the

12  documents requested under the 2004 orders.

13         Correct, Ms. Sokol?

14    MS. SOKOL:  That's correct.

15    MR. NAHMIAS:  All right.  So I'm going to give you

16  back the originals here and then you'll do what you wish

17  with them.

18    MS. SOKOL:  Okay.

19         And I've been requested by Robert Ruben, Chevy

20  Chase's counsel, as well as Sam Kazhaya, Ari Zieger's

21  counsel, to review these documents.  My client and I

22  agree that it is appropriate for them to look at the

23  documents.

24    MR. RUBEN:  Thank you.

25    MR. NAHMIAS:  Which will be done off record.


                                                    136

1    MS. SOKOL:  Yes.

2    MR. NAHMIAS:  Which is now.

3    THE VIDEOGRAPHER:  Off record at 3:41.

4         (Recess taken.)

5    THE VIDEOGRAPHER:  On record at 3:47.

6         (Whereupon Exhibit 10 was marked for

7         identification and is attached hereto.)

8    MR. NAHMIAS:  I'm going to present you, Mr. Somoza,
                        Page 119

Somoza101205.txt

9   with what we'll call Exhibit 10.  This is called a

10  Customer Supplemental Report from Chicago Title.  It's

11  dated 8/10/05.

12      Q   Do you see that?

13      A   Yes.

14      Q   Could you take a moment to review it, please,

15  sir.

16          If you look in the upper right-hand corner

17  you'll see page numbers.  Do you see that?

18      A   (Witness nodding.)

19      Q   Take a look, if you would, please, at Page 20.

20  That sets forth as Item No. 29 a deed of trust to an

21  entity known as Surfside Funding Corporation.  Do you see

22  that?

23      A   Correct.  Yes.

24      Q   And the amount of that indebtedness secured by

25  the property is $250,000?

137

1       A   Correct.

2       Q   Is that obligation current?

3       A   No.

4       Q   It's past due and owing?

5       A   Yes.

6       Q   How delinquent is it?

7       A   I think it was due in August, July or August.

8       Q   Of '05?

9       A   Of '05.

10      Q   Has Surfside commenced its foreclosure

11  proceeding?

12      A   I believe so.

Page 120

Somoza101205.txt

13    Q    You mentioned a Victor Collucci, and for some
14    reason I'm not finding that.  Could you point me to that
15    obligation on this, please.
16    A    I'm not familiar enough with this to know where
17    it would be.
18        MR. NAHMIAS:  Did you see it on here, Robyn?
19        MS. SOKOL:  I'm looking now.
20        MR. NAHMIAS:  Because I thought you said you saw
21    it.
22        THE WITNESS:  Actually, I believe it was recorded
23    after 8/1 so I don't think it would show in this
24    report.
25        MR. NAHMIAS:  Okay.  Fair enough.


                                                        138
1        MS. SOKOL:  I thought I saw it somewhere.
2        MR. NAHMIAS:  I don't see it.
3        Q    So Surfside appears to be in third position?
4        MS. SOKOL:  Oh, there's a copy of the deed of trust
5    attached to this Page 5, and I bet Collucci shows up --
6        THE WITNESS:  It shows recorded 8 -- is that 8/27?
7    5/27?  I can't read the recording date.
8    BY MR. NAHMIAS:
9        Q    It looks like May.
10       A    Oh, but it's dated August 17.
11       Q    Then it's got to be --
12       A    8/27 then.  I guess it was recorded 8/27.
13       MR. RUBEN:  It was executed -- if you look at the
14    notarial acknowledgement.
15    BY MR. NAHMIAS:
16       Q    Which would probably indicate why it's a
                            Page 121

Somoza101205.txt

17    supplemental.

18        A    Got it.

19        Q    Okay.  Let's stick with Page 20 for just a

20    moment.

21             What was the consideration for the Surfside deed

22    of trust?

23        A    They loaned, I believe, $180,000 to Stockwell.

24        Q    "They" being Surfside?

25        A    Yes.  They being Surfside.


                                                         139

1         Q    And so how did 180 turn into 250?

2         A    Points, interest, fees, blood, everything I can

3    get out of it.

4         Q    Is a copy of the Surfside note available?

5         A    It should be.  It was actually recorded against

6    the Wallingford property and then cross collateralized by

7    being on both properties.  So it's probably in the

8    Wallingford.

9         Q    Stack?

10        A    Stack.  And they recorded it on both properties.

11    They'll get paid off with the first one.

12        Q    And Stockwell acquiesced to that?

13        A    Yes.  They are both Stockwell properties.

14        Q    All right.  Turning to Page 5, which is the

15    Victor -- and I can't -- Mary Ann something -- Collucci

16    deed of trust.

17             It's for $600,000?

18        A    Yes.  That's what the deed of trust is for.

19        Q    And how did this -- what was the consideration

20    for this deed of trust?

                        Page 122

Somoza101205.txt

21    A   I don't recall.  I don't want to give a wrong

22  answer, but it's -- I don't recall the amount.

23    Q   Did Stockwell receive funds from Collucci?

24    A   Yes.  I don't recall the exact amount.  That's

25  -- I'm not saying I didn't say that we got funds.  Yes.


                                                     140

1    Stockwell got funds from Collucci.  I don't know exactly

2  what the amount was.

3    Q   Approximating $600,000?

4    A   550, maybe.

5    Q   All right.  But somewhere in that vicinity?

6    A   Yes.  And not disputed.

7    Q   When were those funds received?

8    A   May have been November of '04.

9    Q   Is there a note?

10    A   I don't believe so.  It was a friendly deal that

11  they wanted to make sure they had security for it.

12    Q   Is the note past -- or is the loan past due?

13    A   No.  It is due upon sale, sale or refinance.

14    Q   What do you have to memorialize that?

15    A   This deed.

16    Q   This deed simply grants a lien on the property.

17  From what do you take -- what do you take from this that

18  it would cause you to say that it's due on sale?

19    A   There must be another document then.  This

20  probably is something that was signed at the same time of

21  this then.  I guess you only record the deed.

22    Q   Correct.

23    A   Okay.  Then there's probably a note that went

24  with this that was due upon sale.  I thought it was

                          Page 123

Somoza101205.txt

25      actually written in the deed.


                                                                141
0        1        Q    Well, there is something in the last paragraph

2    that says "if the property is sold."

3        A    Yeah.

4        Q    "That it becomes immediately due and payable,"

5    but that doesn't mean it's not due and payable sooner.

6        A    Promissory note dated April 30.  Yeah.  And

7    there was -- so it's just not attached to this.

8        Q    Is that something that you can access and get a

9    copy?

10        A    Sure.  I should be able to get a copy of that.

11    Put that on the list.

12        MS. SOKOL:  You know where it is?

13        THE WITNESS:  I know where all the deeds -- all the

14    notes are so it should be with them.

15        MS. SOKOL:  Okay.

16    BY MR. NAHMIAS:

17        Q    So this was originally an unsecured loan to

18    Stockwell?

19        A    Yes.

20        Q    And are the Colluccis friends of yours?

21        A    Yes.

22        Q    Does the note provide for interest?

23        A    It provided for -- and, again, that's why I

24    don't know the exact amount.  I believe it was just the

25    difference between what they lent versus the 600,000.


                                                                142

                        Page 124

Somoza101205.txt

1    Q    So if it was 550, for example, the 50,000 is
2    meant to be --
3    A    Compensation.
4    Q    In lieu of interest?
5    A    Yes.
6    Q    Was it intended to be a short term loan?
7    A    Yes.
8    Q    And, again, I'm sorry. Is it past due and
9    owing?
10    A    It's not due yet. In other words, we thought
11    we'd have the property sold prior to that. So it's due
12    upon sale. It didn't sell.
13    Q    But it wasn't due upon sale originally because
14    it wasn't a secured loan originally.
15    A    It was. It just -- it was verbally agreed upon,
16    "Due upon sale. We'll pay it," because --
17    Q    Whenever sale comes about?
18    A    Exactly. Whenever sale comes about. That got
19    memorialized into writing and recorded.
20    Q    And what did Stockwell do with the funds that it
21    received from the Colluccis?
22    A    I believe it was used for the construction costs
23    on Wallingford.
24    Q    We haven't talked much about Wallingford today.
25    I don't really want to get into it now, but this is not

143

1    the first time you've talked about the construction costs
2    over there.
3        Was -- when Wallingford was acquired was there a
4    residence on the premises that had already been

Page 125

Somoza101205.txt

5    constructed?

6        A    Yes.  And completed.  It was left with an

7    unfinished basement about 9,000 square feet.  The

8    construction that I'm calling is not new construction but

9    completing the basement.

10       Q    So finishing?

11       A    We added a wine cellar, a theater, a gym and a

12   spa in the basement.

13       Q    There's one other document here, Item 27, which

14   appears on Page 18.  Do you see some notes -- this

15   pertains to a $1.9 million deed of trust in favor of

16   Stockwell -- excuse me -- in favor of the Charles

17   Burtzloff Living Trust.  There's some notes written

18   there.

19            It looks -- I'm trying to decipher.  Is that

20   your handwriting?

21       A    No.  That would have been the escrow officer.

22       Q    Is that paid through Progressive?

23       A    Paid through Progressive's escrow officer, Cathy

24   Wilson.

25       Q    Does that comport with your understanding?

                                                         144

1        A    Oh, yeah.  It was paid off.

2        Q    And it's been reconveyed?

3        A    Yes.  But it keeps showing up so obviously

4    something wasn't done properly.

5        Q    But it was reconveyed?

6        A    It was reconveyed.  The note was paid in full.

7    I believe it was only a two-month note and it was paid in

8    full.

                        Page 126

Somoza101205.txt

9    Q    Paid back sometime in 2003?

10    A    Absolutely, yes.

11    MR. NAHMIAS:  Off the record.

12    THE VIDEOGRAPHER:  Off record at 3:58.

13    (Discussion off the record.)

14    THE VIDEOGRAPHER:  On record at 4:21.

15    MR. NAHMIAS:  All right.

16    I'm going to mark as Exhibit 11 the appraisal of

17  3970 Brunston Court property.  Date of the evaluation,

18  February 2, '05.

19    (Whereupon Exhibit 11 was marked for

20    identification and is attached hereto.)

21  BY MR. NAHMIAS:

22    Q    Have you seen this document before?

23    A    Yes, I have.

24    Q    It says that it was commissioned for Clarion

25  Mortgage Capital.  Do you see that?

145

1    A    Yes.

2    Q    Who's Clarion?

3    A    No idea.  Some -- one of the many brokers that

4  was working on this.

5    Q    How did you come to receive a copy of this?

6    A    I got it through, I think it was Telstar

7  Mortgage, who actually did -- I think they were working

8  with Clarion Mortgage, but one of them forwarded me a

9  copy.

10    Q    Within the last 12 months have you seen any

11  other appraisals for the 3970 Brunston Court property?

12    A    Yes.

Page 127

Somoza101205.txt

13      Q    Do you have copies of those?

14      A    I do not.  I can get a copy again.  These are

15  not my -- they are not my property.  I know there are

16  other ones that were done and I can get them from the

17  brokers that have done them.  I know of two others.  One

18  wouldn't even let me see it.  One I'm sure I could get.

19  One is fine.

20      Q    Do you know what the amounts are for each of

21  those other ones?

22      A    29 and a half was the one I know of.

23      Q    29 and a half million dollars?

24      A    Is the one I know of.

25           And the other one, I believe, was also 30.


                                                146

1            I also have the one that CHUB did.  CHUB was the

2   insurance company and that was 34 million.

3       Q    When was that conducted?

4       A    It's done annually.  The latest one was,

5   I think, August of last year.

6       Q    August of?

7       A    Of '04 -- no.  August '05.  I'm sorry.  This

8   past August.

9       Q    So, let's say, then there are three appraisals

10  out there?

11      A    That's not a real appraisal.  That's just the

12  insurance.  They do an appraisal based on the cost for

13  insurance reasons.

14      Q    Replacement cost?

15      A    Replacement costs and -- I mean, whatever their

16  appraisal is.

                        Page 128

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   JILL FEENEY
4  Assistant United States Attorney
   California Bar Number: 218506
5  RUTH C. PINKEL
   Assistant United States Attorney
6  California Bar Number: 164470
7       1100 United States Courthouse
        312 North Spring Street
8       Los Angeles, California 90012
        Telephone: (213) 894-2429/6077
9       Facsimile: (213) 894-6269
        E-mail:    jill.feeney@usdoj.gov/ruth.pinkel@usdoj.gov
10 Attorney for Plaintiff
   United States of America
11

12

13                    UNITED STATES DISTRICT COURT

14              FOR THE CENTRAL DISTRICT OF CALIFORNIA

15 UNITED STATES OF AMERICA,    ) CR No. 06-479-AHM
                                )
16              Plaintiff,       ) PLEA AGREEMENT FOR DEFENDANT
                                ) ROBERT A. COBERLY, JR.
17         v.                    )
                                )
18 ROBERT A. COBERLY, JR.,       )
                                )
19              Defendant.       )
                                )
20 _____   )

21      1.   This constitutes the plea agreement between ROBERT A.

22 COBERLY, JR. ("defendant") and the United States Attorney's

23 Office for the Central District of California ("the USAO") in the

24 above-captioned case.  This agreement is limited to the USAO and

25 cannot bind any other federal, state or local prosecuting,

26 administrative or regulatory authorities, except the United

27 States Department of Justice, Tax Division, Criminal Enforcement

28 Section.

<u>PLEA</u>

   2.  Defendant agrees to plead guilty to count one of the indictment <u>United States v. Robert A. Coberly, Jr.</u>, CR No. <u>06-479-AHM</u>, in accordance with the statement of facts attached hereto as Exhibit 2. Defendant also gives up the right to indictment by a grand jury and agrees to plead guilty to a one-count information in the form attached to this agreement at Exhibit 1 or a substantially similar form.

<u>NATURE OF THE OFFENSE</u>

   3.  In order for defendant to be guilty of count one of the indictment which charges a violation of Title 18, United States Code, Section 371, the following must be true: (a) there was an agreement between two or more persons to commit mail fraud and wire fraud; (b) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (c) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. In order for defendant to be guilty of count one of the superseding information which charges a violation of Title 26, United States Code, 7201, the following must be true: (a) the defendant owed federal income tax for the calendar year 2005; (b) defendant knew that federal income tax was owed; (c) the defendant made an affirmative attempt to evade or defeat the income tax; and (d) in attempting to evade or defeat such tax, the defendant acted willfully. Defendant admits that defendant is, in fact, guilty of these offenses as described in count one

2

**EXHIBIT 2**

Exhibit 2

### STATEMENT OF FACTS FOR ROBERT A. COBERLY, JR'S GUILTY PLEAS

Conspiracy Charge

1.    In December 2001, Robert A. Coberly, Jr. ("Coberly")
met Curtis D. Somoza ("Somoza").

2.    Somoza told Coberly about an allegedly profitable prime
bank note investment and convinced Coberly to solicit investors.
Somoza also solicited investors.

3.    From approximately September 2002 through May 2003,
Somoza and Coberly solicited approximately $6.7 million to
purchase of prime bank notes on behalf of about 50 investors
nationwide.  Somoza and Coberly obtained investor money through
RC Investment Corporation ("RC") and Pinnacle Investment
Corporation ("Pinnacle").

4.    Somoza and Coberly told the investors that their funds
would be used to purchase high-grade bank notes with a guaranteed
return of 120% per year.  Contrary to the representations made to
the investors, the majority of the investment funds, close to
80%, were not sent to purchase bonds.  Instead, the majority of
the funds were used to make "interest" payments to earlier
investors in the scheme or by Somoza and Coberly for their own
personal expenses.  Somoza and Coberly falsely led investors to
believe that these payments were profits from the bank note
investments, when in reality there was no "return" on any
investment and no profits.  Somoza and Coberly also failed to
inform investors that a large portion of their funds were being

2

spent by Somoza and Coberly to fund their lifestyles and other
business ventures.

   5.    After an investigation by the Securities and Exchange
Commission, Coberly and Somoza entered into settlement agreements
with the Pinnacle and RC investors.  By a letter dated July 18,
2003, Coberly advised the investors that they would receive a
wire transfer to their bank accounts in the amount of their
outstanding principal balance plus a ten percent return.

   6.    In order to fund the payment of these investors, in
approximately the summer of 2003, Somoza began soliciting funds
from Horace Ardinger, an individual residing in Dallas, Texas.

   7.    In or about July 2003, Ardinger invested $5 million
with Somoza.  Somoza falsely represented to Ardinger that this
money was to be used for bond trading, although Coberly did not
become aware of this misrepresentation until later.  At the time,
Somoza told Coberly that Ardinger had loaned the money to Somoza
using Somoza's residence on Brunston Court as collateral.
Approximately $2.3 million of the $5 million solicited and
received from Ardinger was used by Somoza and Coberly to pay back
RC and Pinnacle investors, although Somoza and Coberly led these
investors to believe that they were receiving a return of their
funds and profits, not funds received from another investor.  In
addition, Somoza and Coberly "paid" the RC/Pinnacle investors
over $5 million, using only the $2.3 million, by convincing

3

investors to re-invest with them, and then using the re-invested
money to pay off other RC/Pinnacle investors.  The remaining $2.7
of the $5 million from Ardinger was used for personal
expenditures by Somoza.

8.    In October 2003, Somoza solicited and received another
$5 million from Ardinger.  Somoza falsely represented to Ardinger
that this money was to be invested in bond trading or
certificates of deposit, although Coberly did not become aware of
either the solicitation of funds or this misrepresentation until
March 2004.  Somoza later told Coberly that he used these funds
to pay off a $1.9 million loan on Somoza's house on Brunston
Court, to buy a computer company, Envoii, and to pay other
personal expenses of Somoza.

9.    In or about December 2003, Somoza solicited and
received from Ardinger another $5 million to be invested in the
insurance pool scheme described more fully below.  Somoza falsely
represented to Ardinger that the funds would be invested in
insurance pools.  Coberly did not become aware of the receipt of
the funds until March 2004 when Somoza falsely told him that the
$5 million was in an account at Asset Max.  In July 2004, Somoza
admitted to Coberly that he had actually spent this money on his
own personal expenses.

10.    In approximately March 2004, Coberly became aware of
the misrepresentations used by Somoza to obtain the first $10

4

million of Ardinger's funds described above in paragraphs 7 and
8. Somoza requested Coberly's help in making it appear that
Ardinger had not been defrauded. Coberly drafted two
declarations for Ardinger to sign which falsely made it seem as
if Ardinger's earlier investments were not earmarked for specific
investments, but instead that Ardinger gave the first $10 million
to Somoza, in July and October 2003, as a loan for Somoza to use
any way he wished. Somoza then convinced Ardinger to sign the
untrue declarations. Also, at this time, Somoza falsely informed
Coberly that the $5 million referenced in paragraph 9 remained in
an escrow account maintained by Asset Max to purchase a life
insurance pool.

11. Beginning in or about July 2003, Somoza and Coberly
solicited individuals, including the previous investors in RC and
Pinnacle, for various investments, including prime bank trading
and real estate.

12. Starting in approximately December 2003, Somoza and
Coberly started utilizing Persistence Capital, LLC to raise funds
from investors for the purchase of pools of life insurance
policies issued by Transamerica Occidental Life Insurance Company
("Transamerica"). The policies would be purchased on behalf of
the Personal Involvement Center ("PIC"), an African-American
church-based organization run by the senior pastor at the Praise
of Zion Baptist Church in South Los Angeles (the "Reverend").

5

The policies were to provide life insurance coverage for members of the Reverend's congregation and other largely African-American PIC members.

13.   Somoza and Coberly told investors that the program would work as follows: Persistence and, later, its related entities (including Persistence Family I, LLC, Persistence Friends I, LLC and Persistence Friends II, LLC) would use the investors' funds to loan money to PIC to purchase pools of life insurance policies on behalf of qualifying PIC members.  The policies would be issued by Transamerica and would generally provide a death benefit of approximately $275,000 per insured. Each policy would provide for the payment of a small death benefit to the insured's beneficiaries (generally $15,000) upon his or her death.  (These benefits would help cover the burial and funeral expenses of the insureds.)  PIC and Persistence would then split the remaining death benefit with $20,000 going to PIC and the remaining $240,000 (or approximately 87% of the total death benefit) going to Persistence or its related entities.

14.   Somoza and Coberly represented to investors that their investment was risk-free and would offer a high rate of return.

15.   Overall, Somoza and Coberly raised approximately $64,634,389 for placement in the purported insurance pools and other alleged investments offered by Persistance and its related entities.  Somoza and Coberly, however, used only $2,246,000 of

6

these investor funds to finance the purchase of life insurance
pools on behalf on PIC. Specifically, in or about March 2004,
Persistance paid approximately $2,246,000 to pay the first year's
premium on Transamerica Pool #1. Later, in or about November
2004, Persistance and its related entities paid approximately
$2,486,059 to pay the first year's premium on Transamerica Pool
#2. However, this second premium payment was not made with
investor funds.

16. Rather than use the investors' funds as promised,
Somoza and Coberly misappropriated the vast majority of the
investors' funds for unauthorized uses, including to make "Ponzi"
payments to the victim-investors in the RC/Pinnacle scheme; to
make "Ponzi" payments to Ardinger and other Persistence
investors, many of which Somoza and Coberly falsely characterized
as "returns" on the investors' insurance programs; to buy luxury
houses, cars, boats, and jewelry for themselves; and to otherwise
support their lavish lifestyles.

17. Somoza, for example, used approximately $3.5 million of
investor funds towards the purchase of a $17 million house
located at 3970 Brunston Court in Westlake Village, California;
approximately over $4.75 million of investor funds towards the
purchase of a $14 million house located at 2571 Wallingford Drive
in Beverly Hills, California; approximately $240,000 to purchase
a 2003 Ferrari sportscar for himself; approximately $220,000 to

7

purchase a Ferrari sportscar for Coberly; approximately $265,000
to purchase an Aston Martin Vanquish automobile; approximately
$292,000 to purchase a 44-foot MTI Supercat Racing Boat; and
approximately $447,000 for the purchase of a Ulysses Nardine
limited edition "Ghenghis Khan" wristwatch.  In addition, Somoza
transferred approximately $4,347,500 of investor monies to
Convoii Inc., and $4,621,000 to Stockwell Properties, LLC, both
of which were companies Somoza owned and controlled.

18.  Coberly also misappropriated investors' money.  For
example, Coberly used approximately $871,000 of the Pinnacle
investor monies in April 2003 towards the purchase of a $4
million house located at 2222 Norfield Court in Westlake Village,
California.  Coberly also transferred approximately $1,036,000 of
the Persistance investors' funds to Sonic Properties, LLC, a
company he owned, controlled, and used solely to pay his personal
household expenses including the following: mortgage; property
taxes; furniture; remodeling; landscaping; utilities; groceries;
personal chefs; personal trainer; nannies; babysitters; clothing;
birthday parties for his children and other personal family
expenses.  Coberly transferred at least approximately $2.4
million of Ardinger's money to Pinnacle to pay back investors in
the RC/Pinnacle scheme, as described in paragraph 7.  He also
used approximately $118,000 of the Persistence investors' funds
to purchase a 2003 Mercedes Benz SL55 convertible.

8

19.   Coberly and Somoza hired the law firm of Loeb & Loeb to represent Persistence Capital, LLC, in or about January 2004. Prior to hiring the firm, Coberly and Somoza had a conversation in which they decided to not tell the law firm they were then under investigation by the SEC for the RC/Pinnacle Investments scheme and were represented by another law firm, Manatt, Phelps & Phillips, in that action. Additionally, during the period of time in which Loeb & Loeb represented Persistence Capital, LLC and Coberly, personally, between January 2004 to mid-September 2004, neither Coberly nor Somoza told any of the Loeb & Loeb attorneys that they had obtained investor funds for alleged investments in the insurance pools by misrepresenting material facts to investors and omitting others. In addition, at no time prior to the filing of the civil action entitled SEC v. RC Investment Corp, et al., CV 04-7400-GHK(Ex) on or about September 8, 2004, did either Coberly or Somoza inform Loeb & Loeb that they were under investigation by the SEC.

20.   Loeb & Loeb provided advice to Persistence Capital, LLC in how to convert their investors, to whom Coberly and Somoza personally owed money pursuant to personal guarantees, to owners of units in the various Persistence Capital LLCs. Starting in approximately June and July 2004, individual investors were solicited by Coberly and Somoza to convert the loans owed to them to ownership units, or equity shares, in the LLCs. In part,

9

Coberly and Somoza wanted to convert the investors to LLC units because they then had no money with which to repay investors, who were owed tens of millions of dollars at that point, and conversion would enable them to put off making any payments to the investors.

21.    In the summer of 2004, during the process of converting investors to units in the LLC, neither Coberly or Somoza informed investors that they, Coberly and Somoza, had no money to pay back investors at that time, or that they had already spent millions of investors funds on their own personal expenses and to pay back other investors.  Similarly, at the time they solicited the vast majority of investor funds, neither Coberly nor Somoza informed investors that they had not received any returns or profit from any investment in life insurance polices, bond trading, real estate investments or anything else.  Coberly and Somoza also caused letters to be sent to investors which misrepresented, among other things, both the risk of the investment, or conversion to the LLC, and the return on the investment.  Coberly purposely did not show these letters to Loeb & Loeb because he felt its attorneys would not allow him to make such misrepresentations to investors.

22.    Somoza and Coberly caused the investors to transfer their funds into accounts controlled by Somoza and Coberly, either by wire transfer or through the mails.

# SECURED PROMISSORY NOTE
# (STRAIGHT NOTE)

$600,000                    Los Angeles, California                    April 30, 2005

### Due Date and Principal Amount Loaned

FOR VALUE RECEIVED, the undersigned, Stockwell Properties LLC, and their title of that entity), jointly and severally (collectively "Maker"), in lawful money of the United States of America, at wherever so designated by Payee/Holder of this Note the principal amount of six hundred thousand dollars with interest at the rate of 2% per annum as to the sum of $6,000 from May 1, 2005 to October 31, 2005, at which time all unpaid principal balance and earned and accrued interest shall become due and payable.

Maker acknowledges its execution of this Secured Promissory Note and Short Form Deed of Trust and Assignment of Rents executed concurrently herewith by Maker as the named Trustor.

### Due on Sale Clause

In the event Maker sells, transfers and/or conveys, voluntary, by operation of law, and/or involuntarily, in whole or in part, some or all of the collateral defined and described in said referenced security instruments and as referenced herein below, or any interest thereof without the prior written consent of the Payee/the Holder of this Note, which consent can be unreasonably and arbitrarily withheld, whether it be by outright sale, transfer, assignment and/or conveyance, Payee/Holder at its option may call, declare and accelerate the entire unpaid principal sum and any and all accrued interest immediately due and payable.

### Prepayment Privilege

This Note and any unpaid principal balance and accrued interest may be prepaid, in whole or in part, at any time during the terms of this Note by Payee without penalty.

### Acceleration Upon Default

Should default be made or upon the failure of Maker to pay any sum specified in this Note when due, or upon a breach or default of any other term, covenant, condition, provision, stipulation and/or agreement of the Note and security instruments as referenced herein, including that certain mortgage instrument executed by Maker as Borrower to the Public Trustee of the county in which the collateral is situated, as trustee, in favor of Payee as Lender, security this Note, or any other instrument given as collateral security for the obligation evidenced by this Note, the entire unpaid principal

indebtedness, or so much thereof as may remain unpaid at the time, plus any earned and accrued interest and any other monetary obligations then due and owing, shall, at the option of the Payee/Holder, become immediately all due and payable; and payment of said principal indebtedness, or the balance thereof, and all interest thereon, together with any and all other sums due under the terms of the Note and mortgage instrument, and/or any other instrument given as collateral security for the obligation evidenced by this Note may be enforced and recovered at once, it being understood and agreed that time and performance are expressly made of the essence.

### Interest on Default

Should default be made in payment of any of the indebtedness evidenced hereby after the entire principal amount hereof shall have become due and payable, whether by acceleration, at maturity, or otherwise, the entire unpaid balance of that principal sum shall bear interest at the rate set forth in this note.

### Time of the Essence

It is understood that time and all performances are expressly and specifically of the essence.

### Waiver Provisions

The Maker, and any endorsers, guarantors, and/or sureties of this Note, and each of them, hereby waive diligence; demand; presentation for payment; notice of non-payment; dishonor; protest; and notice of any renewals or extensions of this Note, whether made to or in favor of the Maker, or any other person or persons. The pleading of any statute of limitations as a defense to any demand against the Maker, or any such endorsers, guarantors and/or sureties is expressly and specifically, knowingly and intelligently, voluntarily and explicitly waived by each and all of said parties, i.e. Maker, endorsers, guarantors and sureties.

Maker hereby expressly waives demand, presentation for payment, notice of dishonor, protest and notice of protest. This Note may not be changed or terminated, except by written agreement signed by the party against whom any enforcement of any change, modification, waiver or discharge is sought.

Wherever a waiver or release is given and/or provided by Maker in favor of Payee/Holder, it is understood that such waiver and/or release is given knowingly, voluntarily, intelligently, expressly and specifically and in the total absence of any fraud, mistake, coercion, undue influence, duress and/or confusion.

## Non-Waiver of Rights by Payee

Neither (i) the failure of Payee/Holder hereof to exercise its rights to accelerate this Note when such option shall be come available, nor (ii) any delay or omission on the part of the Payee/Holder hereof in exercising any right hereunder or any of the agreements referred to herein shall operate or be construed, deemed or understood as a waiver of such option and right or of any such other right hereunder or under the mortgage instrument or under said agreement of any of then, or in event a default has not been cured prior to the time of exercise of any such right by the Payee/Holder hereof.

By accepting payment of any sum due hereunder after it is due and owing, the Payee/Holder hereof shall not be deemed, construed, interpreted and/or understood to have waived its rights to require prompt payment when due of any and all other sums hereunder or to declare an event of default as herein provided for failure to make prompt payment. No delay or omission on the part of the Payee/Holder hereof in exercising any right under this Note or mortgage instrument, or nay other agreement referred to herein shall operate or otherwise be construed, interpreted, understood or otherwise deemed as a waiver of any such right.

## Default Provisions

Maker shall be deemed in default under the terms of this Note or mortgage instrument as referenced herein if any of the following events occur: (i) Maker fails to make any payment when due, (ii)_ Maker breaks any promise or breaches any covenant which Maker has made to Payee, or Maker fails to comply with or otherwise timely perform when due any other term, obligation, covenant, or condition contained in this Note, any mortgage instrument, or any other agreement related to this Note; (iii) Maker defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Maker's property or Maker's ability to repay this Note or perform Maker's obligations under this Note or any of the related documents as referenced herein, including any mortgage instrument; (iv) any representation or statement made or furnished to Payee by Maker or on Maker's behalf is false or misleading in any material respect, either now or at any time made or furnished; (v) Maker becomes insolvent, a Receiver is appointed for any part of Maker's property, Maker makes an assignment for the benefit of creditors, or any proceeding is commenced either by Maker or against Maker under any bankruptcy or insolvency laws; (vi) any creditor tries to take any of Maker's property on or in which Payee has a lien or security interest; (vii) a material adverse change occurs in Maker's financial condition; and (viii) any guarantor dies or any of the other events described in this default section occur with respect to any guarantor of this Note, provided, however, this "(viii)" provision shall not be applicable for purposes of declaring a default, breach, and/or nonperformance, should an on condition that within thirty (30) days of the death of any such guarantor the guarantor's personal representative, executor, or authorized representative of guarantor's estate delivers in writing to Payee/Holder notification unconditionally, absolutely, and irrevocably affirming, acknowledging, and agreeing that:

05/25/2010 18:37 FAX                                                              011/015

(a) the Note, any mortgage instrument or other security instrument executed pursuant to the terms hereof for the benefit of Payee and its assigns and successors, as referenced, described, and/or set forth in this Note, are in full force and effect and constitute legal, valid, binding, and enforceable obligations of the guarantor and its assigns and successors in accordance with and pursuant to its respective terms per said Note, mortgage/security instrument(s) and to which enforcement may be sought pursuant to the applicable state laws;

(b) there are no claims, counter claims, offsets, deductions, and/or defenses, or companion rights thereto, to the Maker's obligations as set forth in this Note and related mortgage/security documents;

(c) any claim, right, and/or remedy on and/or to which a disaffirmance and/or rejection of this Note and any companion mortgage/security instruments and/or documents, and the underlying obligations relating thereto, are expressly, specifically, knowingly, and voluntarily waived, including a waiver of any unknown, unsuspected, and/or unforeseen aspects or claims concerning and/or as a consequence of such waiver pursuant to California Civil Code s1542;

(d) any waivers given are understood to be unconditional, absolute, and irrevocable in all respects and shall be valid and legally binding the guarantor's estate and his representatives;

**Payees Remedies**

All rights and remedies under this Note and mortgage instrument are understood to and shall be cumulative in effect with all other rights and remedies Payee/Holder has or may have in law, at equity, by virtue of the mortgage or security instrument, or otherwise. Failure by Payee/Holder to exercise any right or remedy at any particular time shall not be deemed, construed, interpreted or understood as a waiver of any such right or remedy, or any other rights or remedies.

**Attorneys Fees**

In the event suit or action be instituted on this Note, or any attorney be employed or expenses be incurred to compel payment of this Note or any portion of the indebtedness evidenced hereby, or to defend the priority of the mortgage instrument, or as otherwise provided in the mortgage instrument, Maker promises and agrees to pay all such expenses and attorneys fees actually incurred by the Payee/Holder as a result thereof.

05/25/2010 18:38 FAX                                                      ☒012/015

### Notices

Except as otherwise provided to the contrary herein, any notice herein required or permitted to be given shall be done so in writing and may be personally served or sent by mail to the addresses, and if by mail, shall be deemed to have been given when deposited in the United States mail, registered or certified, return receipt requested, with postage prepaid and properly addressed. Any such notice transmitted through the U.S. Mail shall be deemed effective within three (3) business days of dispatch to the addressee. For the purposes hereof, the addresses of the Maker and Payee (until notice of a change thereof is given as provided in this specific subparagraph) shall be as follows:

If to Maker:

Stockwell Properties, LLC
2934-1/2 Beverly Glen Circle
#390
Bel-Air, CA 90077

If to Payee:

Victor H. Colucci and Marlene M. Colucci
4267 Marina City Drive
#604/606
Marina Del Rey, CA

### Miscellaneous Provisions

Every provision in this Note is intended to be severable. In the event any provision of this Note shall be determined by a body of competent jurisdiction to be void, illegal, invalid, or unenforceable (collectively "Unenforceable"), the remaining terms and provisions of this Note shall not be affected thereby, and each of such remaining terms and provisions of this Note shall be valid and enforceable to the fullest extent permitted by law, unless a party demonstrates by a preponderance of the evidence that the Unenforceable provision was an essential economic or substantive and material term of this Note. This Note and its terms and any ambiguity which may exist or be discovered shall be equally and fairly interpreted by and between Maker and Payee and without reference to the party who prepared or caused to be prepared this Note. To the extend required, Maker hereby waives and releases any rights, privileges, benefits and/or claims under California Civil Code s1654 or any amended or successor statute thereto.

### Allocation of Payments

Payments made per the terms of this Note shall be credited first to interest, then to principal, and then to any other costs, fees or expenses due and owing under this Note. Principal, interest, charges, costs and expenses are payable in lawful money fo the United States of America.

05/25/2010 18:38 FAX                                                          ☒013/015

### Governing Law and Venue

This Note has been delivered to Payee and accepted by Payee in the County of Los Angeles, State of California. This Note shall be governed by, construed and interpreted in accordance with California law. If a lawsuit is filed, Maker agrees upon Payee's request to submit to the jurisdiction of the Courts of Los Angeles County, State of California. Maker and Payee expressly and specifically waive the right to any jury trial in any action, proceeding, cross-complaint, or counter claim brought by either Payee or Maker against the other.

Binding Effect

The terms of this Note shall be binding upon, inure to the benefit and applied to all parties and their respective heirs, legatees, devisees, administrators, personal representatives, executors, successors in interest and assigns.

### Collateral Security Performances and Repayment

This Note is secured by:

(i)    The above referenced mortgage instrument to and in favor of (title company), as Trustee, and recorded against that certain unimproved real property located in the County of (Ventura, California) commonly known as and located at 3970 Brunston Court, Thousand Oaks, CA 91362

STOCKWELL PROPERTIES, LLC

Curtis Somoza, Manager

05/25/2010 18:39 FAX                                                        Ø014/015

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Victor H. Colucci
Marlene M. Colucci
4267 Marina City Drive, Unit 604/606
Marina Del Rey, CA 90292



**20050822-0208255**
Pages: 2    Fees: $14.00
08/22/2005 12:27:26 PM
T20050071939 FO
Ventura County Recorder
Philip J. Schmit

SPACE ABOVE THIS LINE IS
FOR RECORDER'S USE

## DEED OF TRUST

This Deed Of Trust dated August 17, 2005 relates to Stockwell Properties, LLC, a
California Limited Liability Company (herein called TRUSTOR, whose address are
Stockwell Properties 3970 Brunston Court, Westlake Village, California 91362); Chicago
Title Company (herein called TRUSTEE); and Victor H. Colucci and Marlene M.
Colucci (herein called BENEFICIARY).

For the purpose of securing the Promissory Note dated April 30, 2005 in the amount of
$600,000, TRUSTOR grants to TRUSTEE in trust, with power of sale, the Property
commonly known as 3970 Brunston Court, Westlake Village, County of Ventura, State
of California, described as:

Lot 1 of Tract No. 4023, as per map recorded in Book 105, Page(s) 62-68 of Maps, in the
Office of the County Recorder of Ventura County, State of California. Excepting
therefrom all oil, gas and other hydrocarbon substances and other minerals lying below a
depth of 500.00 feet with no rights of surface entry in said property.

In the event TRUSTOR sells the property described herein, all sums then owing under
the Note secured hereby shall become immediately due and payable. Nothing in this
instrument shall in any way restrict or limit TRUSTOR's right to execute other deeds of
trust recorded before or after this Deed of Trust.

Signature of Trustor:

Stockwell Properties, LLC, a California
Limited Liability Company

By: _____
Curtis D. Somoza, Managing Member

1

05/25/2010 18:39 FAX

STATE OF CALIFORNIA
COUNTY OF VENTURA
On Aug 11, 2005 before me TESSA HOTTINGER
a Notary Public in and for said County and State,
personally appeared Curtis D. Somoza, proved to me on the basis
of satisfactory evidence to be the person whose name is subscribed
to the within instrument and acknowledged to me that
he executed the same in his authorized capacity and
that by his signature on the instrument the entity upon
behalf of the person acted executed the instrument.
WITNESS my hand and official seal.

Signature: _____
Notary Public

TESSA HOTTINGER
Commission # 1331255
Notary Public - California
Ventura County
My Comm. Expires Nov 20, 2005

2

**"EXHIBIT 8"**

**Laurel R. Zaeske**

| | |
|---|---|
| **From:** | Laurel R. Zaeske |
| **Sent:** | Thursday, June 10, 2010 11:07 AM |
| **To:** | 'Rothschild, Brian' |
| **Cc:** | Sara A. Maunder |
| **Subject:** | RE: Stockwell Properties |

Brian,

Thank you for your letter. When we spoke the other day I told you that the Trustee needed documentation that the Coluccis paid the funds giving rise to the note (@$550,000). We require either copies of checks or wire transfer information. This would allow the Trustee to trace the funds. Your correspondence does not contain that information. The Stockwell records do not show cash receipts for this amount (or anything similar) during this time frame. You should also be aware that Mrs. Colucci's daughter contacted the Trustee on her behalf and advised the Trustee that the funds related to this note were given to Mr. Zieger and not to Mr. Somoza and/or Stockwell further supporting the need for proof of payment to Stockwell.

Also could you please provide the Trustee with information / explanation as to the following. The Stockwell note is dated April 30, 2005. The deed of trust is dated 31/2 months later or August 17, 2005 (and was recorded August 22, 2005.). Please explain the difference in dates. Also, the DOT is dated the same date that the Stockwell involuntary case was filed. One of the petitioning creditors was Ari Zieger. We understand that Mr. Zieger is the son-in-law of the Coluccis. Putting aside whether Stockwell could give a valid DOT on the date of the involuntary, please advise what information about the involuntary filing the Colucci's were aware of at the time that the DOT was given.

As we discussed, the Trustee will take into consideration any evidence Mrs. Colucci can provide that the note proceeds were to or for the benefit of Stockwell in determining whether to object to the Colucci proof of claim.

Thank you, Laurel

LAUREL R. ZAESKE

RUS, MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 MICHELSON DRIVE
SEVENTH FLOOR
IRVINE, CALIFORNIA 92612
(949) 752-7100 MAIN
(949) 252-1514 FAX
lzaeske@rusmiliband.com
www.rusmiliband.com

CONFIDENTIALITY NOTICE: THIS MESSAGE FROM THE LAW FIRM OF RUS, MILIBAND & SMITH IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT (OR AUTHORIZED TO ACT ON BEHALF OF THE INTENDED RECIPIENT) OF THIS MESSAGE, YOU MAY NOT DISCLOSE, FORWARD, DISTRIBUTE, COPY, OR USE THIS MESSAGE OR ITS CONTENTS. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL AND DELETE THE ORIGINAL MESSAGE FROM YOUR E-MAIL SYSTEM. THANK YOU.

**From:** Rothschild, Brian [mailto:brothschild@akingump.com]
**Sent:** Wednesday, June 09, 2010 6:19 PM
**To:** Sara A. Maunder; Laurel R. Zaeske

**Cc:** 'Peter J. Gurfein'; 'mcolucci@ahla.com'
**Subject:** Stockwell Properties

Dear Laurel:

Attached please find a letter and exhibits providing additional support for Ms. Colucci's claim against Stockwell Properties.

Best regards,

Brian

**Brian Rothschild | Financial Restructuring**
Akin Gump Strauss Hauer and Feld LLP | 2029 Century Park East St. 2400 Los Angeles, CA 90067 |
direct: 310.728.3734 | direct fax: 310.229.1001 | brothschild@akingump.com |
http://www.akingump.com | Google Voice all-purpose locator: 310.876.2299

IRS Circular 230 Notice Requirement: This communication is not given in the form of a
covered opinion, within the meaning of Circular 230 issued by the United States Secretary
of the Treasury. Thus, we are required to inform you that you cannot rely upon any tax
advice contained in this communication for the purpose of avoiding United States federal
tax penalties. In addition, any tax advice contained in this communication may not be
used to promote, market or recommend a transaction to another party.

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above. If you have received this communication
in error, please notify us immediately by e-mail, and delete the original message.